UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LM INSURANCE CORPORATION,
LIBERTY MUTUAL FIRE INSURANCE COMPANY,
LIBERTY MUTUAL PERSONAL INSURANCE COMPANY,
LM GENERAL INSURANCE COMPANY,
SAFECO INSURANCE COMPANY OF ILLINOIS,
AMERICAN STATES INSURANCE COMPANY, and
WAUSAU UNDERWRITERS INSURANCE COMPANY,

Plaintiffs,

v.

PARS MEDICAL P.C.,
CADS ANESTHESIA SERVICES PLLC,
ISAAC KREIZMAN, M.D.,
MICHAEL GARBULSKY, RPA-C, and
CHARLES SUEDE, M.D.,

Defendants.

C.A. No.:

## COMPLAINT AND DEMAND FOR JURY TRIAL

The plaintiffs, LM Insurance Corporation, Liberty Mutual Fire Insurance Company, Liberty Mutual Personal Insurance Company, LM General Insurance Company, Safeco Insurance Company of Illinois, American States Insurance Company, and Wausau Underwriters Insurance Company (collectively, "Liberty Mutual" and/or "plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink, P.C., allege as follows:

1. The Defendant, Isaac Kreizman, M.D. ("Kreizman"), through his medical professional corporation ("PC"), PARS Medical P.C. ("PARS Medical"), conspired with Michael Garbulsky, RPA-C ("Garbulsky") and Charles Suede, M.D. ("Suede"), through CADS Anesthesia Services, PLLC ("CADS Anesthesia"), to engage in an ongoing and continuous scheme to fraudulently bill Liberty Mutual directly for No-Fault benefits.

2. The Defendants took advantage of New York's No-Fault laws, whose protections provide eligible claimants with at least $50,000 in coverage for accident-related medical expenses and other losses ("No-Fault benefits").

3. Claimants can assign their No-Fault benefits to medical providers, which enables providers to submit No-Fault bills directly to the claimants' insurers.

4. The Defendants billed for services not provided to Liberty Mutual claimants in violation of the law.

5. The Defendants billed Liberty Mutual for medically unnecessary services at unlawfully excessive rates in violation of the law.

6. Specifically, the Defendants ordered Liberty Mutual claimants to undergo unnecessary procedures to generate massive medical fees.

7. The Defendants engaged in an unlawful referral scheme and/or illegal kickback scheme in violation of New York Public Health Law §§ 238-a and 238-d. Despite being in admitted financial relationships with each other and several referral clinics, the Defendants failed to provide the necessary self-disclosure notification required by New York Public Health Law §§ 238-a and 238-d

8. The Defendants seriously jeopardized the health, safety, and well-being of claimants through this scheme—their drive for profits exposed patients to serious bodily harm.

9. The Defendants operated at several different locations around New York, including, but not limited to:

- 108-25 Merrick Blvd, Jamaica, NY 11433;
- 102-34 Atlantic Ave, South Ozone Park, NY 11416;
- 79-09B Northern Blvd, Jackson Heights, NY 11372;
- 108 Kenilworth Pl, Brooklyn, NY 11210;
- 2673 Atlantic Ave, Brooklyn, NY 11207;
- 1611 E. New York Ave, Brooklyn, NY 11212;

- 2115 Surf Ave, Brooklyn, NY 11224;
- 1 Fulton Ave, Hempstead, NY 11550;
- 903 Sheridan Ave, Bronx, NY 10451;
- 787 Meacham Ave, Elmont, NY 11003;
- 175 Fulton Ave, Hempstead, NY 11550;
- 5223 9th Ave, Brooklyn, NY 11220;
- 2071 Clove Rd, Staten Island, NY 10304;
- 313 43rd Street, Brooklyn, NY 11232;
- 8211 37th Ave 3260, Jackson Heights, NY 11372;
- 2460 Flatbush Ave, Brooklyn, NY 11234;
- 150 Graham Ave, Brooklyn, NY 11206;
- 9208 Liberty Ave, Ozone Park, NY 11417;
- 219-16 Linden Blvd, Cambria Heights, NY 11411;
- 486 Macdonald Ave, Brooklyn, NY 11218;
- 1038 Ocean Ave, Brooklyn, NY 11226;
- 1005 Roosevelt Ave, Corona, NY 11368; and
- 3140-B Tremont Ave, Bronx, NY 10461.

10. The Defendants' violated the law by not properly disclosing their financial relationships with the referral clinics to Liberty Mutual claimants.

11. The Defendants paid "rent" to Citimed Management Services Inc, Jackson Heights Total Chiropractic, P.C., We Care Medical P.C., NY Metro Chiropractic, P.C., Graham Wellness Medical, P.C., ESM Quality PT, P.C., Way to Rehab PT, P.C., Motion Sync P.T. P.C., Physical Therapy Link, P.C., Finesse Care Physical Therapy P.C., Rose Chiropractic Health & Wellness P.C., IM Care PT P.C., Diana Beynin DC, P.C., One Hand 1 Physical Therapy P.C., Surgicare of Brooklyn, Radius PT P.C., East New York Medical P.C., and Gordon C. Davis Medical, P.C. (collectively referred to as the "Referral Clinics") by entering into an unlawful referral relationship involving undisclosed financial relationships and kickbacks.

12. Many of the Referral Clinics have a history of being sued in insurance fraud racketeering cases:

- In *Allstate Ins. Co. v. Better Hands Physical Therapy P.C.*, Civil Action No. 1:24-cv-04580-PKC-CLP (E.D.N.Y. 2024), it is alleged that Finesse Care Physical Therapy P.C., among others, billed for medically unnecessary physical therapy

services when they were, at all times, owned and controlled by non-licensed laypeople in violation of New York law. These unlicensed laypeople used shell companies to conceal their unlawful operation and control of Finesse Care Physical Therapy P.C. and others.

- In *Allstate Ins. Co. v. Rose*, Civil Action No. 1:24-cv-00014-HG (E.D.N.Y. 2024), it is alleged that Rose Chiropractic Health & Wellness, P.C. falsely billed for chiropractic treatment that was not medically necessary and was rendered pursuant to a predetermined treatment protocol solely to maximize profits. The scheme involved enlisting other healthcare providers to falsely organize professional service entities under their licensing credentials when, in fact, they had no actual power or control over these entities.

- In *Gov't Empls. Ins. Co. v. Beynin*, Civil Action No. 1:19-cv-06118-DG-TAM (E.D.N.Y. 2019), it is alleged that Diana Beynin, D.C., among others, performed fraudulent healthcare services through her entities to support illegal kickback and self-referral arrangements. These fraudulent healthcare services were not medically necessary and were provided pursuant to a predetermined treatment protocol that was solely designed to maximize profit rather than provide aid to patients.

- In *Gov't Empls. Ins. Co. v. Jacobson*, Civil Action No. 1:15-cv-07236-ERK-RML (E.D.N.Y. 2015), it is alleged that Diana Beynin, D.C., among others, performed fraudulent healthcare services as an independent contractor to support illegal kickback and self-referral arrangements. These fraudulent healthcare services were not medically necessary and were provided pursuant to a predetermined treatment protocol that was solely designed to maximize profit rather than provide aid to patients.

- In *Roosevelt Road Re, Ltd. v. Wingate, Russotti, Shapiro, Moses & Halperin, LLP*, Civil Action No. 1:24-cv-06259-NCM-VMS (E.D.N.Y. 2024), it is alleged that Surgicare of Brooklyn, among others, served as the operation facility for claimants to receive medically unnecessary surgeries as part of a scheme to stage accidents and bill for excessive fraudulent treatment that only served to inflate lawsuit settlement

13. The Defendants were not eligible to collect No-Fault payments because they failed to comply with applicable licensing requirements.

14. The Defendants' scheme damaged Liberty Mutual through the submission of fraudulent No-Fault claims.

15. In furtherance of their scheme, the Defendants intentionally submitted statutory claim forms, which falsely certified each entity's eligibility to collect No-Fault payments.

16. Liberty Mutual reasonably relied on the facial validity of the medical documentation mailed by the Defendants when making payments to these enterprises.

17. The success of the Defendants' fraud scheme relied on the transmission to Liberty Mutual, through the U.S. Mail, of invoices, bills, and other No-Fault claim documents warranting the Defendants' eligibility to collect No-Fault payments under New York law.

18. The Defendants intentionally submitted to Liberty Mutual hundreds of bills knowing that none of the bills were lawfully compensable.

19. All of the acts and omissions of the Defendants described throughout this Complaint were undertaken intentionally

20. Liberty Mutual brings this action against the Defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common-law fraud; and (c) unjust enrichment.

21. This Complaint seeks actual damages of more than $827,647.42, which represent No-Fault benefit payments that Liberty Mutual was wrongfully induced to make to the Defendants.

22. Liberty Mutual also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to make any further payments to PARS Medical and CADS Anesthesia in connection with any No-Fault claims submitted to Liberty Mutual in connection with this scheme because (a) services were not provided; (b) services that did not comply with state and local licensure law; (c) services that involved unlawful referrals, undisclosed financial arrangements, and kickbacks; (d) services were not medically necessary; and (e) charges exceeded the amounts allowed under the applicable Fee Schedule.

# I. THE PARTIES

## A. PLAINTIFFS

23. Liberty Mutual Personal Insurance Company is a company duly organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business in Boston, Massachusetts. Liberty Mutual Personal Insurance Company is authorized to conduct business in the State of New York.

24. Liberty Mutual Fire Insurance Company and Wausau Underwriters Insurance Company are companies duly organized and existing under the laws of the State of Wisconsin with their principal place of business in Boston, Massachusetts. Liberty Mutual Fire Insurance Company and Wausau Underwriters Insurance Company are authorized to conduct business in the State of New York.

25. LM Insurance Corporation, Safeco Insurance Company of Illinois, and LM General Insurance Company are companies duly organized and existing under the laws of the State of Illinois with their principal place of business in Boston, Massachusetts. LM Insurance Corporation, Safeco Insurance Company of Illinois, and LM General Insurance Company are authorized to conduct business in the State of New York.

26. American States Insurance Company is duly organized and existing under the laws of the State of Indiana with its principal place of business in Boston, Massachusetts. American States Insurance Company is authorized to conduct business in the State of New York.

## B. DEFENDANTS

### 1. Isaac Kreizman, M.D.

27. Kreizman resides in and is a citizen of the State of New York.

28. Kreizman was licensed to practice medicine in the State of New York during the relevant period.

29. Kreizman participated in this scheme by (a) causing PARS Medical to bill Liberty Mutual for services not rendered; (b) causing the unlawful referral of Liberty Mutual claimants from CADS Anesthesia and the Referral Clinics; (c) causing PARS Medical to bill for medically unnecessary services at excessive charges; and (d) taking part in the operation and management of the Referral Clinics.

30. Kreizman is therefore responsible for the fraudulent No-Fault claims submitted to Liberty Mutual by PARS Medical.

31. Kreizman participated in the operation and management of the PARS Medical and CADS Anesthesia enterprises by engaging in an unlawful referral relationship, and is therefore responsible for the fraudulent medical services billed to Liberty Mutual by PARS Medical and CADS Anesthesia.

**2. <u>PARS Medical P.C.</u>**

32. PARS Medical is a professional corporation under New York law.

33. PARS Medical's principal place of business is located at 5223 9th Avenue, Brooklyn, New York 11220.

34. Kreizman was the owner of PARS Medical during the relevant period.

35. Kreizman used PARS Medical to bill for services not rendered to Liberty Mutual claimants.

36. Suede participated in the operation and management of PARS Medical by providing unnecessary and unlawful anesthesia services and by paying rent as kickbacks.

37. The Referral Clinics routinely and unlawfully referred patients to the Defendants without proper patient financial disclosures in violation of the law.

38. Further, PARS Medical submitted fraudulent charges to Liberty Mutual.

39. PARS Medical was not lawfully entitled to seek or collect No-Fault payments.

40. PARS Medical participated in the operation and management of the CADS Anesthesia enterprise by making unlawful referrals and by engaging in an unlawful kickback scheme disguised as rent, and is therefore responsible for the fraudulent medical services billed to Liberty Mutual.

### 3. <u>Michael Garbulsky, RPA-C</u>

41. Garbulsky resides in and is a citizen of the State of New York.

42. Garbulsky was licensed to practice medicine in the State of New York during the relevant period.

43. Garbulsky participated in this scheme by (a) causing PARS Medical to bill Liberty Mutual for services not rendered; (b) causing the unlawful referral of Liberty Mutual claimants from the Referral Clinics; (c) causing PARS Medical to bill for medically unnecessary services at excessive charges; and (d) taking part in the operation and management of the Referral Clinics.

44. Garbulsky is therefore responsible for the fraudulent No-Fault claims submitted to Liberty Mutual by PARS Medical.

45. Garbulsky participated in the operation and management of the PARS Medical enterprise by engaging in an unlawful relationship, and is therefore responsible for the fraudulent medical services billed to Liberty Mutual by PARS Medical.

### 4. <u>Charles Suede, M.D.</u>

46. Suede resides in and is a citizen of the State of New York.

47. Suede was licensed to practice medicine in the State of New York during the relevant period.

48. Suede participated in this scheme by (a) causing CADS Anesthesia to bill Liberty Mutual for services not rendered; (b) causing CADS Anesthesia to bill for unlicensed services; (c) causing the unlawful referral of Liberty Mutual claimants from CADS Anesthesia and the Referral

Clinics; (d) causing CADS Anesthesia to bill for medically unnecessary services at excessive charges; and (e) taking part in the operation and management of the Referral Clinics.

49. Suede is therefore responsible for the fraudulent No-Fault claims submitted to Liberty Mutual by CADS Anesthesia.

50. Suede participated in the operation and management of the PARS Medical and CADS Anesthesia enterprises by engaging in an unlawful relationship, and is therefore responsible for the fraudulent medical services billed to Liberty Mutual by PARS Medical and CADS Anesthesia.

**5. <u>CADS Anesthesia Services PLLC</u>**

51. CADS Anesthesia is a professional limited liability company under New York law.

52. CADS Anesthesia's principal place of business is located at 4640 Bay Parkway, Brooklyn, NY 11230.

53. Suede was the owner of CADS Anesthesia during the relevant period.

54. Suede used CADS Anesthesia to bill for services not rendered to Liberty Mutual claimants.

55. Suede participated in the operation and management of CADS Anesthesia by providing unnecessary and unlawful anesthesia services and by paying rent as kickbacks.

56. The Referral Clinics routinely and unlawfully referred patients to the Defendants without proper patient financial disclosures in violation of the law.

57. Further, CADS Anesthesia submitted fraudulent charges to Liberty Mutual.

58. CADS Anesthesia was not lawfully entitled to seek or collect No-Fault payments.

59. CADS Anesthesia participated in the operation and management of the PARS Medical enterprise by engaging in an unlawful kickback scheme disguised as rent, and is therefore responsible for the fraudulent medical services billed to Liberty Mutual.

## II. JURISDICTION AND VENUE

60. Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

61. Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

62. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of acts known to Liberty Mutual alleged herein were carried out within the Eastern District of New York.

63. PARS Medical and CADS Anesthesia conducted business in the State of New York by submitting bills for medical services at numerous clinics located in Kings County.

64. The Defendants also conducted business in the State of New York by (a) submitting bills under New York's No-Fault laws for medical services that were purportedly provided to patients who lived in New York or who were covered by New York automobile insurance policies issued by Liberty Mutual, and (b) by receiving referrals of these New York-based patients for arthroscopic surgeries, injections, and other procedures.

65. The Referral Clinics include referrals to PARS Medical for procedures wherein PARS Medical submitted bills for services to New York-based patients.

66. The Defendants personally benefitted from the amounts that Liberty Mutual paid to PARS Medical and CADS Anesthesia under New York's No-Fault laws.

67. The Defendants have therefore engaged in purposeful activities in New York by conducting business in New York.

68. The Defendants have also engaged in purposeful activities in New York by causing PARS Medical and CADS Anesthesia to initiate arbitration proceedings in New York against Liberty Mutual.

69. The Defendants used arbitrations and state court litigation to monetize their fraud against Liberty Mutual in such a way to essentially finance their fraudulent practices with proceeds paid by Liberty Mutual.

70. The Defendants pattern of submitting and adjudicating baseless and repetitive claims have themselves helped to perpetuate their RICO violations.

71. Specifically, the Defendants routinely commence frivolous arbitrations and/or state court litigation after Liberty Mutual denies their claims to fraudulently obtain No-Fault benefits that are used to finance the RICO scheme.

72. The Defendants' activities in and contact with New York were purposely sought and transacted to take advantage of the benefits available under the No-Fault laws.

73. The allegations and causes of action asserted herein arise from the Defendants' conduct within the State of New York, and their purposeful availment of New York's No-Fault insurance system, and therefore there is no question that there exists a substantial relationship between the transactions at issue, and Liberty Mutual's causes of action.

74. Overall, the fraudulent scheme alleged herein has many ties to the State of New York, and the ends of justice are best served through this Court's exercise of jurisdiction over the Defendants.

## III. APPLICABLE NO-FAULT LAWS AND LICENSING STATUTES

### A. NEW YORK'S NO-FAULT LAWS AND REGULATIONS

75. Liberty Mutual underwrites automobile insurance in the State of New York.

76. New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services.

77. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act

(N.Y. Ins. Law § 5101, *et seq*.), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq*.) (collectively, "the No-Fault laws"), automobile insurers are required to provide Personal Injury Protection Benefits (hereinafter, "No-Fault benefits") to Liberty Mutual Claimants.

78. Under New York No-Fault law, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

79. "Basic economic loss" is defined to include "all necessary expenses" for medical services. N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

80. No-Fault benefits include up to $50,000.00 per Liberty Mutual Claimant for reasonable expenses that are incurred for necessary healthcare goods and services.

81. A patient can assign their No-Fault benefits to healthcare service providers.

82. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by the New York State Department of Financial Services formerly known as the New York State Department of Insurance ("DOI") (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

83. Alternatively, healthcare providers may submit claims to insurance carriers using the Health Insurance Claim Form (known as the "CMS-1500" and "CMS-1450" forms).

84. The NF-3, CMS-1500 and CMS-1450 forms are important documents in the insurance industry. They certify that the provider's request for payment is not materially false, misleading, or fraudulent. 11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

85. Pursuant to N.Y. Ins. Law § 403(d), each NF-3, CMS-1500 and CMS-1450 forms carry the same warning by substance: "Any person who knowingly and with intent to defraud any

insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent act, which is a crime."

86. A healthcare provider makes a material misrepresentation when it submits an NF-3, CMS-1500 and CMS-1450 forms that either omits or misrepresents material information about the provider's eligibility to seek or collect payment under New York's No-Fault laws.

87. It is a material misrepresentation to submit NF-3, CMS-1500, and CMS-1450 forms for treatment, testing, and other services that: (a) are never provided; (b) are billed in violation of state and local licensure law; (c) not medically necessary; or (c) are billed at a greater monetary charge than is permitted by the applicable Fee Schedule.

88. Under New York law, a provider of healthcare services is not eligible for No-Fault reimbursement if the provider fails to meet **any** applicable New York state or local licensing requirement necessary to perform such service in New York, **or** if the provider fails to meet **any** licensing requirement necessary to perform the service in any other state in which the service is performed. 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

89. Accordingly, if a professional healthcare service provider fails to meet any applicable licensing requirement necessary to perform a service, then the provider is not lawfully entitled to seek or collect No-Fault benefits under New York's No-Fault laws.

90. As alleged herein, the Defendants failed to comply with several laws and regulations when providing healthcare services to claimants during the course of this scheme; therefore, the Defendants are not—and never were—eligible to seek or collect No-Fault benefits from Liberty Mutual.

## B. NEW YORK WORKERS' COMPENSATION FEE SCHEDULE

91. In terms of the fees charged by healthcare providers, the New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("NY Fee Schedule").

92. The NY Fee Schedule is used by healthcare providers and insurers to determine the level of reimbursement payable on legitimate claims.

93. The purpose of the NY Fee Schedule is to: (a) provide comprehensive billing guidelines to allow healthcare providers to appropriately describe their services and minimize disputes over reimbursement through the establishment of maximum permissible fees that can be ***charged*** for services included in the Fee Schedule; and (b) set limits on charges that can be advanced by healthcare service providers to protect claimants from having their medical benefit limits artificially eroded by excessive fees.

94. Under Insurance Law § 5102(a)(1), the term "basic economic loss" covers "all necessary expenses incurred for…medical, hospital…, surgical…[and] any other professional health services."

95. In determining basic economic loss, the expenses incurred under Insurance Law § 5102(a)(1) "shall be in accordance with the limitations" of Insurance Law § 5108.

96. Pursuant to Insurance Law § 5108(b), the Superintendent of Insurance "shall promulgate rules and regulations implementing and coordinating the provisions of [the No-Fault laws] and the workers' compensation law with respect to the charges for the professional health services specified" in Insurance Law § 5102(a)(1), "including the establishment of schedules for all such services for which schedules have not been prepared and established by the chairman of the workers' compensation board."

97. Insurance Law § 5108(a) also provides that the "charges for services specified in"

Insurance Law § 5102(a)(1) "shall not exceed the charges permissible under the schedule prepared and established by the chairman of the workers' compensation board." *See also* 11 N.Y.C.R.R. § 65-3.16(a)(1) ("Payment for medical expenses shall be in accordance with fee schedules promulgated under section 5108 of the Insurance Law…").

98. Under 11 N.Y.C.R.R. § 68.6, titled "Health services performed outside New York State," the amounts reimbursable under New York's No-Fault law are limited based upon, among other things, the residence of the eligible injured person.

99. The amendments to section 68.6, effective January 23, 2018, were intended to "address[] the ongoing exploitation of New York's no-fault system by out-of-state providers who, taking advantage of current provisions in the regulation, submit grossly inflated bills for services rendered, thus quickly depleting the $50,000 no-fault coverage limit available to an eligible injured party ("EIP")." *See* Assessment of public comments for the Thirty-Third Amendment to 11 N.Y.C.R.R. 68 (Insurance Regulation 83).

100. The amended version of 11 N.Y.C.R.R. § 68.6 states, in pertinent part, that "if a professional health service reimbursable under Insurance Law section 5102(a)(1) is performed outside [the State of New York] with respect to an eligible injured person that is a resident of[the State of New York,] the amount that the insurer shall reimburse for the service shall be the *lower* of:

a. the amount of the fee set forth in the region of [the State of New York] that has the highest applicable amount in the fee schedule for that service;
b. the amount charged by the provider; and
c. the prevailing fee in the geographic location of the provider." 11 N.Y.C.R.R. § 68.6(b) (emphasis added).

### C. <u>NEW YORK LAW REGARDING SELF-REFERRALS</u>

101. The Public Health Laws prohibit certain financial arrangements between health care providers to protect against potential abuse, particularly in circumstances in which referrals may be driven by profit rather than by medical necessity or patient care. *See* N.Y. Pub. Health L. § 238-a(5)(b)(vii); *see also Cambridge Med., P.C. v. Allstate Ins. Co.*, 899 F. Supp. 2d 227, 232 (E.D.N.Y. 2012)

102. Where a referral is made in violation of the Public Health Laws, "neither the referring provider nor the provider of the service are entitled to payment from a third-party insurer." *Cambridge Med.*, 899 F. Supp. at 232.

103. When a healthcare provider refers a patient to another provider or facility inwhich the referring provider, or their immediate family member, has a financial relationship, such a referral creates the risk of unnecessary services because the provider's own financial motivations might be placed ahead of the actual needs of the patient, thereby raising healthcare costs and subjecting patients to unnecessary care.

104. To control the risks posed by such self-referrals, New York Public Health Law § 238-a prohibits certain healthcare service providers from referring patients to another healthcare service provider (or to an immediate family member of the provider) for certain services where a financial relationship exists between the providers.

105. Siblings are expressly included in the statute's definition of "immediate family member." *See* N.Y. Pub. Health Law § 238(8); 10 N.Y.C.R.R. § 34-1.2(h).

106. "Financial relationship" is defined by the statute as "an ownership interest, investment interest, or compensation arrangement." *See* N.Y. Pub. Health Law § 238(3); 10 N.Y.C.R.R. § 34-1.2(c); *see also* N.Y. Pub. Health Law § 238-a(3) (defining ownership interest or investment interest).

107. New York Public Health Law § 238-d pertains to practitioner disclosure requirements for certain referrals that are not prohibited by, or subject to an exception under, section 238-a. *See also* 10 N.Y.C.R.R. § 34-1.5(a).

108. Section 238-d(1)(a) prohibits a practitioner from making "a referral to a health care provider for the furnishing of any health or health related items or services where such practitioner or immediate family member of such practitioner has…an ownership or investment interest…with such health care provider" without disclosing the financial relationship to the patient. *See also* 10 N.Y.C.R.R. § 34-1.5(a)(1).

109. Section 238-d(2) requires that the disclosure "provide notice of any such financial relationship and shall also inform the patient of his or her right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available." *See also* 10 N.Y.C.R.R. § 34-1.5(b).

110. The applicable regulations prescribe the form that the disclosure must take and also require that the disclosure "be posted prominently in the practitioner's office." *See* 10 N.Y.C.R.R. § 34-1.5(b); 10 N.Y.C.R.R. § 34-1.6.

111. Accordingly, if a referral is subject to section 238-d and the disclosure requirement is not met, then the provider has failed to comply with applicable licensing regulations and is therefore ineligible to collect No-Fault payments.

### D. NEW YORK LAWS APPLICABLE TO PROFESSIONAL HEALTHCARE SERVICE PROVIDERS

112. Additionally, New York's Education Law and Business Corporation Law also apply to professional healthcare providers, such as individual licensees and professional service enterprises.

113. Under New York Education Law § 6530, it is professional misconduct for a

licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatment not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

114. Moreover, New York law prohibits physicians from taking advantage of their patients for their own or someone else's financial gain, such as through accepting fees in exchange for referrals or promoting the sale of certain services or goods.

115. Specifically, New York Education Law § 6530(18) provides that professional misconduct for physicians includes "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services."

116. Further, a physician engages in professional misconduct in "[e]xercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party." N.Y. Educ. Law § 6530(17).

117. Similarly, section 6531 provides for an additional definition of professional misconduct for physicians in the case where a physician "has directly or indirectly requested, received or participated in the division, transference, assignment, rebate, splitting, or refunding of a fee for, or has directly requested, received, or profited by means of a credit or other valuable consideration as a commission, discount or gratuity, in connection with the furnishing of professional care or service, including…physiotherapy or other therapeutic service or equipment…[or] orthopedic or surgical appliances or supplies…or any other goods, services, or supplies prescribed for medical diagnosis, care, or treatment under this chapter[.]" N.Y. Educ. Law § 6531.

## IV. FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

### A. GENERAL OVERVIEW OF DEFENDANTS' SCHEME TO DEFRAUD

118. The Defendants' scheme was designed to drain their patients' No-Fault benefits by billing for (a) services that were not provided; (b) services that did not comply with state and local licensure law; (c) services that involved unlawful referrals, undisclosed financial arrangements, and kickbacks; (d) services that were not medically necessary; and (e) charges that exceeded the amounts allowed under the applicable Fee Schedule.

119. The Defendants' billing damaged Liberty Mutual by causing the payment of No-Fault benefits for the fraudulent services.

120. The Defendants engaged in a sophisticated fraud scheme wherein they would receive unlawful referrals pursuant to an illegal kickback scheme to provide unnecessary pain management procedures and anesthesia to fraudulently inflate insurance claims.

121. The documents submitted to Liberty Mutual misrepresent the legitimacy of the healthcare services that were prescribed to patients of PARS Medical and CADS Anesthesia whereas these services were provided pursuant to an unlawful referral arrangement.

122. The Defendants violated New York Law by making improper referrals without the required patient disclosures.

123. PARS Medical operated pursuant to this unlawful arrangement from the Referral Clinic locations, including, but not limited to:

- 108-25 Merrick Blvd, Jamaica, NY 11433;
- 102-34 Atlantic Ave, South Ozone Park, NY 11416;
- 79-09B Northern Blvd, Jackson Heights, NY 11372;
- 108 Kenilworth Pl, Brooklyn, NY 11210;
- 2673 Atlantic Ave, Brooklyn, NY 11207;
- 1611 E. New York Ave, Brooklyn, NY 11212;
- 2115 Surf Ave, Brooklyn, NY 11224;
- 1 Fulton Ave, Hempstead, NY 11550;

- 903 Sheridan Ave, Bronx, NY 10451;
- 787 Meacham Ave, Elmont, NY 11003;
- 175 Fulton Ave, Hempstead, NY 11550;
- 5223 9th Ave, Brooklyn, NY 11220;
- 2071 Clove Rd, Staten Island, NY 10304;
- 313 43rd Street, Brooklyn, NY 11232;
- 8211 37th Ave 3260, Jackson Heights, NY 11372;
- 2460 Flatbush Ave, Brooklyn, NY 11234;
- 150 Graham Ave, Brooklyn, NY 11206;
- 9208 Liberty Ave, Ozone Park, NY 11417;
- 219-16 Linden Blvd, Cambria Heights, NY 11411;
- 486 Macdonald Ave, Brooklyn, NY 11218;
- 1038 Ocean Ave, Brooklyn, NY 11226;
- 1005 Roosevelt Ave, Corona, NY 11368; and
- 3140-B Tremont Ave, Bronx, NY 10461.

124. The scheme is orchestrated whereby a PARS Medical nurse practitioner appears at one of the above-referenced clinic locations and reportedly performs an initial evaluation of the patient.

125. Kreizman testified that he has never been to the following Referral Clinic addresses:

- 108-25 Merrick Blvd, Jamaica, NY 11433;
- 102-34 Atlantic Ave, South Ozone Park, NY 11416;
- 79-09B Northern Blvd, Jackson Heights, NY 11372;
- 108 Kenilworth Pl, Brooklyn, NY 11210;
- 2673 Atlantic Ave, Brooklyn, NY 11207;
- 1611 E. New York Ave, Brooklyn, NY 11212;
- 2115 Surf Ave, Brooklyn, NY 11224;
- 1 Fulton Ave, Hempstead, NY 11550;
- 903 Sheridan Ave, Bronx, NY 10451;
- 787 Meacham Ave, Elmont, NY 11003;
- 175 Fulton Ave, Hempstead, NY 11550;
- 8211 37th Ave 3260, Jackson Heights, NY 11372;
- 2460 Flatbush Ave, Brooklyn, NY 11234;
- 150 Graham Ave, Brooklyn, NY 11206;
- 9208 Liberty Ave, Ozone Park, NY 11417;
- 219-16 Linden Blvd, Cambria Heights, NY 11411;
- 486 Macdonald Ave, Brooklyn, NY 11218;

- 1038 Ocean Ave, Brooklyn, NY 11226;
- 1005 Roosevelt Ave, Corona, NY 11368; and
- 3140-B Tremont Ave, Bronx, NY 10461.

126. A true and accurate statement of the testimony of Kreizman is depicted below:

> Q Do you ever go to any of these locations?
>
> A No. I only go to the 9th Avenue location, the Staten Island location and the surgical center.

127. The physician assistant, Michael Garbulsky, negotiated the lease terms with the Referral Clinics.

128. A true and accurate statement of the testimony of Kreizman is depicted below:

> Q So the two lease agreements that were provided in advance of the Examination Under Oath are for the Clove location and the 9th Avenue location for PARS Medical.
>
> The lease agreements, to the extent they exist for any of these locations, they were not provided. So I'm just going to ask if there is a lease agreement, how does it come about?
>
> A Usually my coordinator, Michael, will meet with the office. He'll speak to the offices as far as the need for pain services. Some places, you know, need us once a month. Some places

> they have patients for twice a month, some for not even -- some for even less and then -- and then Michael will go ahead and then negotiate with those facilities.

129. These initial evaluations are cursory in nature and do not support the litany of treatment subsequently provided.

130. Following the evaluation, the PARS Medical nurse practitioner will refer the patient to PARS Medical and Kreizman for a pain procedure.

131. During the pain procedure, PARS Medical and Kreizman would exclusively utilize CADS Anesthesia and Suede to provide any anesthesia services.

132. The Defendants misrepresented the medical necessity of the healthcare services that were purportedly provided by the Defendants, including evaluations, injections, percutaneous discectomies, and anesthesia services.

133. PARS Medical fraudulently billed for epidurography pursuant to CPT Code 72275.

134. PARS Medical fraudulently billed for percutaneous discectomies.

135. Moreover, PARS Medical routinely fraudulently billed percutaneous discectomies as open procedures.

136. These percutaneous discectomies are often implemented under anesthesia solely to inflate the claim.

137. CADS Anesthesia and Suede fraudulently billed for these unnecessary anesthesia services.

138. Moreover, PARS Medical routinely bills for a second doctor during the procedure, which is completely unnecessary.

139. PARS also fraudulently billed for Intradiscal Electrothermoplasty ("IDET") purportedly performed as a separate procedure at the same time as a percutaneous discectomy.

140. The scheme was created to bill for initial patient examinations, follow-up examinations, and various pain management and surgical services at PARS Medical.

141. The referrals from CADS Anesthesia and the Referral Clinics were unlawful because written notice of financial interests was not given to the patients in accordance with applicable law.

142. The failure to properly disclose the relationships between CADS Anesthesia and the Referral Clinics is unlawful, and billing for any service is fraudulent.

143. Upon information and belief, PARS Medical unlawfully billed for the services of PARS Medical nurse practitioners that were independent contractors.

144. The Defendants were never eligible to collect No-Fault payments from Liberty Mutual because of this fraudulent conduct.

## B. IMPROPER DISCLOSURES IN VIOLATION OF THE LAW

145. NY Public Health Law § 238-a prohibits certain health care service providers from referring the performance of services such as medical testing and other services to those with whom they have financial relationship. *See* N.Y. Pub. Health L. § 238-a(1)(a).

146. In the event that Section 238-a is violated, ***neither*** the referring provider nor the provider of the service are entitled to payment from a third-party insurer, such as Liberty Mutual. *See* N.Y. Pub. Health L. § 238-a(1)(b). *See also Cambridge Med., P.C. v. Allstate Ins. Co.*, 2012 U.S. Dist. LEXIS 150269, *11 (E.D.N.Y. 2012).

147. Section 238-d(2) requires that the disclosure "provide notice of any such financial relationship and shall also inform the patient of his or her right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available."

148. If a referral is subject to section 238-d and the disclosure requirement is not met, then the provider has failed to comply with applicable licensing regulations and is therefore ineligible to collect No-Fault payments.

149. The Defendants engaged in an unlawful referral and kickback scheme with the Referral Clinics.

150. The documentation submitted to Liberty Mutual by the Defendants misrepresented the legitimacy of healthcare services to Liberty Mutual claimants because the services were provided pursuant to an unlawful referral and kickback arrangement.

### 1. <u>Citimed Management Services Inc</u>

151. PARS Medical leased space from Citimed Management Services Inc ("Citimed") at 100-05 Roosevelt Avenue, Suite 102, Corona, NY 11368.

152. Kreizman denied a lease with Citimed.

153. A true and accurate excerpt of the lease between PARS Medical and Citimed is depicted below:

> COMMERCIAL SUB-LEASE AGREEMENT
>
> THIS COMMERCIAL SUB-LEASE AGREEMENT (hereinafter referred to as the "Agreement") is effective as of October 1st, 2021 (hereinafter referred to as the "Effective Date"), by and between Citimed Management Services, Inc., having a principal address of 9901 63rd Road, Rego Park, NY 11374 (hereinafter referred to as "Sub-Lessor") and Pars Medical, P.C. having a principal address 5223 9th Ave, Brooklyn, NY 11220 (hereinafter referred to as "Sub-Lessee"). Sub-Lessor and Sub-Lessee contract and agree as follows:
>
> 1. Sub-Lessor hereby leases unto Sub-Lessee the following land and any improvements thereon: (hereafter referred to as the "the leased property"). To wit: 100-05 Roosevelt Ave, Suite 102, Corona, NY 11368.

> | SUB-LESSOR | SUB-LESSEE |
> |---|---|
> | Citimed Management Services, Inc | Pars Medical, P.C. |
> | By: | By: Isaac J. Kreizman, M.D. |

154. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

155. Kreizman testified to the financial relationship between PARS Medical and Jackson Heights Chiropractic.

156. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is

depicted below:

Q Do you work for CitiMed?
A We -- I see patients. I see CitiMed patients. I only work for myself, but I do go and see patients. So one of the nurse practitioners will see patients at CitiMed.

Q So you, Isaac Kreizman, do not treat CitiMed patients per se?
A So I do treat CitiMed patients. Once my nurse practitioner

sees a patient and identifies a patient at CitiMed that needs my services, then the nurse practitioner will then send the patient to me to evaluate that patient for further care or interventional care or other pain care. So the nurse practitioner will screen a patient and then I will then see the patient if the patient requires any services.

157. Despite being in an admitted financial relationship with Citimed, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health

Law §§ 238-a and 238-d.

158. In light of the unlawful referrals to Citimed, none of the services billed to Liberty Mutual by PARS Medical and/or Citimed are compensable.

159. All billing and records of Citimed and PARS Medical pursuant to this unlawful referral relationship traveled through the U.S. Mail.

160. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

161. The Defendants violated New York law by making improper referrals without the required patient disclosures.

162. The Defendants violated New York law by making referrals pursuant to an illegal kickback scheme.

163. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with Citimed, thus rendering all treatment by the Defendants unlawful.

**2. <u>Jackson Heights Total Chiropractic, P.C.</u>**

164. PARS Medical leased space from Jackson Heights Total Chiropractic, P.C. ("Jackson Heights Chiropractic") at 82-11 37th Avenue, Suite 602, Jackson Heights, NY 11372.

165. A true and accurate excerpt of the lease between PARS Medical and Jackson Heights Chiropractic is depicted below:

**OFFICE SUBLEASE AGREEMENT**

Please consult with your Attorney before signing this lease

| | |
|---|---|
| SUBLANDLORD:<br>JACKSON HEIGHTS TOTAL<br>CHIROPRACTIC P.C<br>82-11 37 AVENUE , SUITE 602<br>JACKSON HEIGHTS, NY,11372 | SUBTENANT:<br>PARS MEDICAL P.C |
| Lease Term: 1 YEAR | Monthly Rent: $2000 |
| Beginning Date. June, 1,2024 | Annual Rent. $24.000 |

**Sublandlord:**

**BY: JACKSON HEIGHTS TOTAL CHIROPRACTIC P.C**

**TAX ID:** [redacted]

Mario Duque

(Print Name)

(Signature)

Date: 06-01-2024

**Subtenant:**

**BY: PARS MEDICAL P.C**

**TAX ID:** _____- _____

Isaac Kreizman , M.D

(Print Name)

(Signature)

Date: 06-01-2024

166. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

167. Kreizman testified to the financial relationship between PARS Medical and Jackson Heights Chiropractic.

168. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

Q Do you know the address locations and the name of the facilities

at which your employees treat patients, besides at the two PARS locations, facilities?

A Yes.

Q Sir, if you'd like to read that into the record, what clinic address locations and the clinic names, that

would be great.

A Sure.

A So the 80 -- sorry. 82-11 37th Avenue, Suite 602, Jackson Heights, New York.

Q Do you know what the business is there?

A It's Jackson Heights Total Chiropractic.

169. Despite being in an admitted financial relationship with Jackson Heights Chiropractic, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

170. In light of the unlawful referrals to Jackson Heights Chiropractic, none of the services billed to Liberty Mutual by PARS Medical and/or Jackson Heights Chiropractic are compensable.

171. All billing and records of Jackson Heights Chiropractic and PARS Medical pursuant to this unlawful referral relationship traveled through the U.S. Mail.

172. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

173. The Defendants violated New York law by making improper referrals without the required patient disclosures.

174. The Defendants violated New York law by making referrals pursuant to an illegal kickback scheme.

175. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with Jackson Heights Chiropractic, thus rendering all treatment by the Defendants unlawful.

**3. <u>We Care Medical P.C.</u>**

176. PARS Medical leased space from We Care Medical P.C. ("We Care Medical") at 2460 Flatbush Avenue, Brooklyn, NY 11234.

177. Upon information and belief, there is no written lease between PARS Medical and We Care Medical.

178. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

179. Kreizman testified to the financial relationship between PARS Medical and We Care Medical.

180. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

A So then after that is my two locations which we have and then it's 2460 Flatbush Avenue, Brooklyn, New York.

Q The name of that facility?

A The name of that facility is We Care. We Care, PC.

Q That's the name of the office?

A Yeah. That's the name of the office, We Care Medical, PC.

181. Despite being in an admitted financial relationship with We Care Medical, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

182. In light of the unlawful referrals to We Care Medical, none of the services billed to Liberty Mutual by PARS Medical and/or We Care Medical are compensable.

183. All billing and records of We Care Medical and PARS Medical pursuant to this unlawful referral relationship traveled through the U.S. Mail.

184. All of the PARS Medical billing for unlawful referrals and kickbacks are

fraudulent.

185. The Defendants violated New York law by making improper referrals without the required patient disclosures.

186. The Defendants violated New York law by making referrals pursuant to an illegal kickback scheme.

187. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with We Care Medical, thus rendering all treatment by the Defendants unlawful.

### 4. <u>NY Metro Chiropractic, P.C.</u>

188. PARS Medical leased space from NY Metro Chiropractic, P.C. ("NY Metro Chiropractic") at 175 Fulton Avenue, Suite 503, Hempstead, NY 11550.

189. A true and accurate excerpt of the lease between PARS Medical and NY Metro Chiropractic is depicted below:

The lease has been drafted on 8-29-2023 between NY metro chiropractic pc and
For leasing out the business owned by PARS Medical at:
175 Fulton ave Hempstead NY 11550
Suite 503
Lessee hereby offers to lease from Lessor the premises situated in Nassau County, State of New York, described as OFFICE SPACE in the offices located at:
NY metro chiropractic PC
175 Fulton ave suite 503 Hempstead NY 11550.



Lessee:

Sign:

Print: Isaac J. Kreizman MD

Date: 8-29-2023

Lessor:

Sign: Glenn Whitney, D.C.

Print: Glenn Whitney, D.C.

Date: 8-29-2023

190. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

191. Kreizman testified to the financial relationship between PARS Medical and NY Metro Chiropractic.

192. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

Q Sure.
A 175 Fulton Avenue, Suite 503, Hempstead, New York.
Q What facility is that?
A Give me a minute. It's New York Metro Chiropractic.

193. Despite being in an admitted financial relationship with NY Metro Chiropractic, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

194. In light of the unlawful referrals to NY Metro Chiropractic, none of the services billed to Liberty Mutual by PARS Medical and/or NY Metro Chiropractic are compensable.

195. All billing and records of NY Metro Chiropractic and PARS Medical pursuant to

this unlawful referral relationship traveled through the U.S. Mail.

196. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

197. The Defendants violated New York law by making improper referrals without the required patient disclosures.

198. The Defendants violated New York law by making referrals pursuant to an illegal kickback scheme.

199. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with NY Metro Chiropractic, thus rendering all treatment by the Defendants unlawful.

### 5. **<u>Graham Wellness Medical, P.C.</u>**

200. PARS Medical leased space from Graham Wellness Medical, P.C. ("Graham Wellness Medical") at 150 Graham Avenue, Brooklyn. NY 11203.

201. A true and accurate excerpt of the lease between PARS Medical and Graham Wellness Medical is depicted below:

## Commercial Sublease Agreement

This Sublease dated: 11/03/2023

Between: graham wellness medical P.C. (THE "Landlord")

-And-

PARS MEDICAL P.C. (THE "Subtenant")

Packground:

This agreement (the "sublease") to sublet real property according to the terms specified below

Sublease Premises:

The Landlord leases to the subtenant the portion of the premises located at 150 graham ave bk ny 11203

Subtenant
Leaser

Sub-Leaser

Signature

Signature

Date

Date

202. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

203. Kreizman testified to the financial relationship between PARS Medical and Graham Wellness Medical.

204. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

Q All right.

A Next one is 150 Graham Avenue.

Here, 150 Graham Avenue, Graham Wellness Medical, PC.

205. Despite being in an admitted financial relationship with Graham Wellness Medical, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

206. In light of the unlawful referrals to Graham Wellness Medical, none of the services billed to Liberty Mutual by PARS Medical and/or Graham Wellness Medical are compensable.

207. All billing and records of Graham Wellness Medical and PARS Medical pursuant to this unlawful referral relationship traveled through the U.S. Mail.

208. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

209. The Defendants violated New York law by making improper referrals without the required patient disclosures.

210. The Defendants violated New York law by making referrals pursuant to an illegal kickback scheme.

211. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the

financial relationship with Graham Wellness Medical, thus rendering all treatment by the Defendants unlawful.

**6. <u>ESM Quality PT, P.C.</u>**

212. PARS Medical leased space from ESM Quality PT, P.C. ("ESM Quality PT") at 108 Kenilworth Place, Brooklyn, NY 11210.

213. A true and accurate excerpt of the lease between PARS Medical and ESM Quality PT is depicted below:

<u>COMMERCIAL SUBLEASE AGREEMENT</u>

THIS SUBLEASE: dated the___1__ day of _May______, 2024

BETWEEN:

ESM QUALITY PT, PC
(The "Sub-landlord")

OF THE FIRST PART

-AND-

PARS MEDICAL PC
(The "Subtenant")

OF THE SECOND PART

<u>Background</u>

A. _This is an agreement (the "Sublease") to the sublet real property according to the terms specified below.
B. The Premises are located at 108 Kenilworth Pl. Brooklyn, NY 11210

IN WITNESS WHERE OF the Sub-landlord and the Subtenant have duly affixed their signatures under hand and seal on this___I___ day of ___May____, 2024.

BY: ____________________
ESM QUALITY P.T. PC.
Essam Mostafa
"Sub-landlord"

BY: ____________________
PARS MEDICAL PC
Isaac J. Kreitzman, MD
"Subtenant"

214. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

215. Kreizman testified to the financial relationship between PARS Medical and ESM Quality PT.

216. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

A The next one is 108 Kenilworth Place, which is ESM Quality PT, PC.

217. Despite being in an admitted financial relationship with ESM Quality PT, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

218. In light of the unlawful referrals to ESM Quality PT, none of the services billed to Liberty Mutual by PARS Medical and/or ESM Quality PT are compensable.

219. All billing and records of ESM Quality PT and PARS Medical pursuant to this

unlawful referral relationship traveled through the U.S. Mail.

220. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

221. The Defendants violated New York law by making improper referrals without the required patient disclosures.

222. The Defendants violated New York law by making referrals pursuant to an illegal kickback scheme.

223. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with ESM Quality PT, thus rendering all treatment by the Defendants unlawful.

**7. <u>Way to Rehab PT, P.C.</u>**

224. PARS Medical leased space from Way to Rehab PT, P.C. ("Way to Rehab PT") at 9208 Liberty Avenue, Ozone Park, NY 11417.

225. Upon information and belief, there is no written lease between PARS Medical and Way to Rehab PT.

226. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

227. Kreizman testified to the financial relationship between PARS Medical and Way to Rehab PT.

228. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

> The next one is 9208 Liberty Avenue in Ozone, New York and that's Way to Rehab Physical Therapy, PC.

229. Despite being in an admitted financial relationship with Way to Rehab PT, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

230. In light of the unlawful referrals to Way to Rehab PT, none of the services billed to Liberty Mutual by PARS Medical and/or Way to Rehab PT are compensable.

231. All billing and records of Way to Rehab PT and PARS Medical pursuant to this unlawful referral relationship traveled through the U.S. Mail.

232. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

233. The Defendants violated New York law by making improper referrals without the required patient disclosures.

234. The Defendants violated New York law by making referrals pursuant to an illegal kickback scheme.

235. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with Way to Rehab PT, thus rendering all treatment by the Defendants unlawful.

**8. <u>Motion Sync P.T., P.C.</u>**

236. PARS Medical leased space from Motion Sync P.T., P.C. ("Motion Sync PT") at 219-16 Linden Boulevard, Cambria Heights, NY 11411.

237. A true and accurate excerpt of the lease between PARS Medical and Motion Sync PT is depicted below:

**COMMERCIAL SUBLEASE AGREEMENT**

**This Sublease dated 08/01/2024**

**Between:**

**Motion Sync PT P.C.** (THE "Landlord")

-And-

Pars Medical P.C. (THE "Subtenant")

**Background:**

- This agreement (the "sublease") to sublet real property according to the terms specified below.

**Subleased Premises:**

The Landlord leases to the subtenant the portion of the premises located at **219-16 Linden Blvd 1st Fl Cambria Heights, NY 11411.**


**Subtenant:**

**Leaser:**

Motion Sync PT. P.C.

Signature:

Date: 8/1/24

**Sub-leaser:**

Pars medical P.C.

Signature:

Date:

238. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

239. Kreizman testified to the financial relationship between PARS Medical and Motion Sync PT.

240. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

The next one is 219-16 Linden Boulevard in Cambria Heights and that is Motion Sync Physical Therapy, PC.

241. Despite being in an admitted financial relationship with Motion Sync PT, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

242. In light of the unlawful referrals to Motion Sync PT, none of the services billed to Liberty Mutual by PARS Medical and/or Motion Sync PT are compensable.

243. All billing and records of Motion Sync PT and PARS Medical pursuant to this unlawful referral relationship traveled through the U.S. Mail.

244. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

245. The Defendants violated New York law by making improper referrals without the required patient disclosures.

246. The Defendants violated New York law by making referrals pursuant to an illegal kickback scheme.

247. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with Motion Sync PT, thus rendering all treatment by the Defendants unlawful.

**9. <u>Physical Therapy Link, P.C.</u>**

248. PARS Medical leased space from Physical Therapy Link, P.C. ("PT Link") at 486 McDonald Avenue, Brooklyn, NY 11218.

249. A true and accurate excerpt of the lease between PARS Medical and PT Link is depicted below:



**LEASE AND SERVICES AGREEMENT**

LEASE AND SERVICES AGREEMENT (hereinafter "Agreement") made as of this the 24th day of June 2024 by and between **Physical Therapy Link PC** having an office at 486 McDonald Ave , Brooklyn, NY 11218 and PARS Medical P.C 5223 9th Ave. Brooklyn NY 11220


**Physical Therapy Link PC**

BY:

Title: owner

By:

Title:

250. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

251. Kreizman testified to the financial relationship between PARS Medical and PT Link.

252. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

> The next one is 486 McDonald Avenue, sorry and that is Mohammed Sadeia, that's S-A-D like in David E-I-A, Physical Therapy.

253. Despite being in an admitted financial relationship with PT Link, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

254. In light of the unlawful referrals to PT Link, none of the services billed to Liberty Mutual by PARS Medical and/or PT Link are compensable.

255. All billing and records of PT Link and PARS Medical pursuant to this unlawful referral relationship traveled through the U.S. Mail.

256. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

257. The Defendants violated New York law by making improper referrals without the required patient disclosures.

258. The Defendants violated New York law by making referrals pursuant to an illegal kickback scheme.

259. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with PT Link, thus rendering all treatment by the Defendants unlawful.

**10. Finesse Care Physical Therapy P.C.**

260. PARS Medical leased space from Finesse Care Physical Therapy, P.C. ("Finesse Care PT") at 787 Meacham Avenue, Elmont, NY 11003.

261. Upon information and belief, there is no written lease between PARS Medical and Finesse Care PT.

262. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

263. Kreizman testified to the financial relationship between PARS Medical and Finesse Care PT.

264. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

```
        The next one is 787 Meacham
```

> Avenue and that would be the Finesse Care
> Physical Therapy, PC.

265. Despite being in an admitted financial relationship with Finesse Care PT, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

266. In light of the unlawful referrals to Finesse Care PT, none of the services billed to Liberty Mutual by PARS Medical and/or Finesse Care PT are compensable.

267. All billing and records of Finesse Care PT and PARS Medical pursuant to this unlawful referral relationship traveled through the U.S. Mail.

268. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

269. The Defendants violated New York law by making improper referrals without the required patient disclosures.

270. The Defendants violated New York law by making referrals pursuant to an illegal kickback scheme.

271. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with Finesse Care PT, thus rendering all treatment by the Defendants unlawful.

**11. <u>Rose Chiropractic Health & Wellness P.C.</u>**

272. PARS Medical leased space from Rose Chiropractic Health & Wellness, P.C. ("Rose Chiropractic") at 108-25 Merrick Boulevard, Jamaica, NY 11433.

273. Upon information and belief, there is no written lease between PARS Medical and

Rose Chiropractic.

274. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

275. Kreizman testified to the financial relationship between PARS Medical and Rose Chiropractic.

276. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

> The next one is 108-25
> Merrick Boulevard and that's in Jamaica,
> New York and that will be Rose
> Chiropractic, PC.

277. Despite being in an admitted financial relationship with Rose Chiropractic, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

278. In light of the unlawful referrals to Rose Chiropractic, none of the services billed to Liberty Mutual by PARS Medical and/or Rose Chiropractic are compensable.

279. All billing and records of Rose Chiropractic and PARS Medical pursuant to this unlawful referral relationship traveled through the U.S. Mail.

280. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

281. The Defendants violated New York law by making improper referrals without the required patient disclosures.

282. The Defendants violated New York law by making referrals pursuant to an illegal

kickback scheme.

283. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with Rose Chiropractic, thus rendering all treatment by the Defendants unlawful.

**12. <u>IM Care PT, P.C.</u>**

284. PARS Medical leased space from IM Care PT, P.C. ("IM Care PT") at 1038 Ocean Ave, Brooklyn, NY 11226.

285. A true and accurate excerpt of the lease between PARS Medical and IM Care PT is depicted below:

<u>COMMERCIAL SUBLEASE AGREEMENT</u>

**THIS SUBLEASE:** dated the 16th day of September 2024

**BETWEEN:** **IM CARE PT PC**

(The "Sub-landlord")

**OF THE FIRST PART**

**-AND-**

**PARS Medical PC**

(The "Subtenant")

**OF THE SECOND PART**

**<u>Background</u>**

**A.** _This is an agreement (the "Sublease") to the sublet real property according to the terms specified below.

**B.** The Premises are located at

IN WITNESS WHERE OF the Sub-landlord and the Subtenant have duly affixed their signatures under hand and seal on this 16th day of September 2024.

BY:____________________
IM CARE PT PC
"Sub-landlord"

BY:____________________
Pars Medical PC
Isaac J. Kreitzman, MD
"Subtenant"

286. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

287. Kreizman testified to the financial relationship between PARS Medical and IM Care PT.

288. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

The next one is 1038 Ocean Avenue and that would be IM Care PT, PC.

289. Despite being in an admitted financial relationship with IM Care PT, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

290. In light of the unlawful referrals to IM Care PT, none of the services billed to Liberty Mutual by PARS Medical and/or IM Care PT are compensable.

291. All billing and records of IM Care PT and PARS Medical pursuant to this unlawful referral relationship traveled through the U.S. Mail.

292. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

293. The Defendants violated New York law by making improper referrals without the required patient disclosures.

294. The Defendants violated New York law by making referrals pursuant to an illegal kickback scheme.

295. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with IM Care PT, thus rendering all treatment by the Defendants unlawful.

**13. Diana Beynin DC, P.C.**

296. PARS Medical leased space from Diana Beynin DC, P.C. ("Beynin DC PC") at 903 Sheridan Ave, Bronx, NY 10451.

297. A true and accurate excerpt of the lease between PARS Medical and Beynin DC PC is depicted below:



SUB- LEASE AGREEMENT

This agreement is made on the day of ~~April~~ 1, 2023

Diana Beynin DC
903 Sheridan Ave
Bronx NY 10451

BETWEEN:

(Hereinafter referred to as the "Landlord")

AND:

(Hereinafter referred to as the "Tenant")



BY:*DIANA BEYNIN DC*

(Landlord)

AND

***P.A.R.S Medical***

(TENANT)

298. Upon information and belief, the payments disguised as rent were illegal kickbacks

for the referral of patients.

299. Kreizman testified to the financial relationship between PARS Medical and Beynin DC PC.

300. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

> The next one is 903 Sheridan Avenue and that is --

> A And that's Diana Beynin, Chiropractor.

301. Despite being in an admitted financial relationship with Beynin DC PC, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

302. In light of the unlawful referrals to Beynin DC PC, none of the services billed to Liberty Mutual by PARS Medical and/or Beynin DC PC are compensable.

303. All billing and records of Beynin DC PC and PARS Medical pursuant to this unlawful referral relationship traveled through the U.S. Mail.

304. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

305. The Defendants violated New York law by making improper referrals without the required patient disclosures.

306. The Defendants violated New York law by making referrals pursuant to an illegal

kickback scheme.

307. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with Diana Beynin DC, P.C., thus rendering all treatment by the Defendants unlawful.

### 14. <u>One Hand 1 Physical Therapy P.C.</u>

308. PARS Medical leased space from One Hand 1 Physical Therapy P.C. ("One Hand PT") at 2115 Surf Ave, Brooklyn, NY 11224.

309. Upon information and belief, there is no written lease between PARS Medical and One Hand PT.

310. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

311. Kreizman testified to the financial relationship between PARS Medical and One Hand PT.

312. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

And then there's 2115 Surf Avenue.
Q Did you say 2115 or 2116?
A 2115 Surf Avenue.
Q Okay.
A And that's One Hand Physical Therapy, PC.

313. Despite being in an admitted financial relationship with One Hand PT, PARS

Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

314. In light of the unlawful referrals to One Hand PT, none of the services billed to Liberty Mutual by PARS Medical and/or One Hand PT are compensable.

315. All billing and records of One Hand PT and PARS Medical pursuant to this unlawful referral relationship traveled through the U.S. Mail.

316. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

317. The Defendants violated New York law by making improper referrals without the required patient disclosures.

318. The Defendants violated New York law by making referrals pursuant to an illegal kickback scheme.

319. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with One Hand PT, thus rendering all treatment by the Defendants unlawful.

**15. Surgicare of Brooklyn**

320. PARS Medical leased space from Surgicare of Brooklyn ("Surgicare") at 313 43rd Street, Brooklyn, NY 11232.

321. Upon information and belief, there is no written lease between PARS Medical and Surgicare.

322. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

323. Kreizman testified to the financial relationship between PARS Medical and Surgicare.

324. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

Q Now, SurgiCare, where are they located? Did you tell me?

A 313 --

Q 33rd Avenue, 33rd Street?

A 43rd Street, right. Correct.

Q So what did you say?

A Yes.

Q 33rd Street?

A It's on 313 43rd Street.

325. Despite being in an admitted financial relationship with Surgicare, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

326. In light of the unlawful referrals to Surgicare, none of the services billed to Liberty Mutual by PARS Medical and/or Surgicare are compensable.

327. All billing and records of Surgicare and PARS Medical pursuant to this unlawful referral relationship traveled through the U.S. Mail.

328. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

329. The Defendants violated New York law by making improper referrals without the required patient disclosures.

330. The Defendants violated New York law by making referrals pursuant to an illegal

kickback scheme.

331. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with Surgicare, thus rendering all treatment by the Defendants unlawful.

**16. <u>Radius PT P.C.</u>**

332. PARS Medical leased space from Radius PT P.C. ("Radius PT") at 3140-B Tremont Ave, Bronx, NY 10461.

333. Upon information and belief, there is no written lease between PARS Medical and Radius PT.

334. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

335. Kreizman testified to the financial relationship between PARS Medical and Radius PT.

336. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

> And the last one is 3140B Tremont Avenue and that is Radius Physical Therapy.

337. Despite being in an admitted financial relationship with Radius PT, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

338. In light of the unlawful referrals to Radius PT, none of the services billed to Liberty Mutual by PARS Medical and/or Radius PT are compensable.

339. All billing and records of Radius PT and PARS Medical pursuant to this unlawful referral relationship traveled through the U.S. Mail.

340. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

341. The Defendants violated New York law by making improper referrals without the required patient disclosures.

342. The Defendants violated New York law by making referrals pursuant to an illegal kickback scheme.

343. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with Radius PT, thus rendering all treatment by the Defendants unlawful.

### 17. East New York Medical P.C.

344. PARS Medical leased space from East New York Medical P.C. ("East NY Medical") at 2673 Atlantic Ave, Brooklyn, NY 11207.

345. Upon information and belief, there is no written lease between PARS Medical and East NY Medical.

346. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

347. Kreizman testified to the financial relationship between PARS Medical and East NY Medical.

348. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

> How about 260 -- 26-73
> Atlantic Avenue in Brooklyn?

> A Yes, yes. I have that by
> me. That's East New York Medical, PC.

349. Despite being in an admitted financial relationship with East NY Medical, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

350. In light of the unlawful referrals to East NY Medical, none of the services billed to Liberty Mutual by PARS Medical and/or East NY Medical are compensable.

351. All billing and records of East NY Medical and PARS Medical pursuant to this unlawful referral relationship traveled through the U.S. Mail.

352. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

353. The Defendants violated New York law by making improper referrals without the required patient disclosures.

354. The Defendants violated New York law by making referrals pursuant to an illegal kickback scheme.

355. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with East NY Medical, thus rendering all treatment by the Defendants unlawful.

**18. Gordon C. Davis Medical, P.C.**

356. PARS Medical leased space from Gordon C. Davis Medical, P.C. ("Davis Medical") at 1611 E. New York Ave, Brooklyn, NY 11212.

357. Upon information and belief, there is no written lease between PARS Medical and Davis Medical.

358. Upon information and belief, the payments disguised as rent were illegal kickbacks for the referral of patients.

359. Kreizman testified to the financial relationship between PARS Medical and Davis Medical.

360. A true and accurate excerpt of Kreizman's Examination Under Oath testimony is depicted below:

> 1611 East New York Avenue in Brooklyn?
>
> A Yes. That is Davis Gordon Medical, PC.

361. Despite being in an admitted financial relationship with Davis Medical, PARS Medical and Kreizman did not provide patients with the disclosures required under New York Public Health Law §§ 238-a and 238-d.

362. In light of the unlawful referrals to Davis Medical, none of the services billed to Liberty Mutual by PARS Medical and/or Davis Medical are compensable.

363. All billing and records of Davis Medical and PARS Medical pursuant to this unlawful referral relationship traveled through the U.S. Mail.

364. All of the PARS Medical billing for unlawful referrals and kickbacks are fraudulent.

365. The Defendants violated New York law by making improper referrals without the required patient disclosures.

366. The Defendants violated New York law by making referrals pursuant to an illegal kickback scheme.

367. In many claims submitted to Liberty Mutual, the Defendants failed to disclose the financial relationship with Davis Medical, thus rendering all treatment by the Defendants unlawful.

**19. <u>CADS Anesthesia Services PLLC</u>**

368. PARS Medical leased space to CADS Anesthesia at the 5223 9th Avenue, Brooklyn, NY 11220 and 2071 Clove Rd, Staten Island, NY 10304 locations.

369. CADS Anesthesia pays a monthly rent of $10,000.00.

370. A true and accurate payment from CADS Anesthesia to PARS Medical is depicted below:



CADS ANESTHESIA SERVICES PLLC.
4640 BAY PARKWAY BROOKLYN, NY 11230

1-8/210 137

2449

DATE

PAY TO THE ORDER OF

$

DOLLARS

citibank
CITIBANK, N.A

MEMO

[redacted]

371. This payment is disguised as rent but it is actually a payment for the referral of patients.

372. A true and accurate excerpt from the Examination Under Oath testimony of Kreizman is depicted below:

Q And now I asked you a question earlier about an individual named, I closed the web page, his name is -- is it Charles Suede?

A Yes.

Q He's the anesthesiologist; is that correct?

A That's correct.

Q Do you sublease any part of Clove Road or 9th Avenue?

A Only I sublease I guess the anesthesiologist that pays -- he subleases some of that space.

Q And some of the space at

> Clove Road?
>
> A At both Clove and 9th Avenue. The anesthesiologist also pays rent for being there.
>
> Q Do you know how much he pays?
>
> A I would have to go back and take a look at the agreement. I don't recall exactly how much.
>
> Q Now, can you remind me of the anesthesiologist's name again?
>
> A Dr. Suede.
>
> Q Suede, S-U-E-D-E?
>
> A Yeah. Just like the fabric.
>
> Q And when you're engaging in either providing injections, percutaneous discectomies, anything under anesthesia at one of your two locations, do you provide patients with a disclosure regarding your lease agreement with the anesthesiologist?
>
> A No.

## C. Unlawful Provision of Unnecessary Medical Services

373. Liberty Mutual claimants were ordered to undergo unnecessary surgeries, injections, and other treatments.

374. Eligible patients can collect No-Fault payments to cover their "basic economic loss," which includes lost wages and ***necessary*** medical expenses up to $50,000.00. *See* N.Y. Ins.

Law § 5102.

375. As assignees of the patients, the Defendants are only entitled to collect No-Fault payments for services that are medically necessary and related to an automobile accident.

376. The American Medical Association defines medical necessity as: "Healthcare services or products that a prudent physician would provide to a patient for the purpose of preventing, diagnosing or treating an illness, injury, disease, or symptoms in a manner that is (a) in accordance, with generally accepted standards of medical practice; (b) clinically appropriate in terms of type, frequency, extent, site, and duration; and (c) not primarily for the economic benefit of the health plans and purchasers or for the convenience of the patient, treating physician, or other health care provider" (Institute of Medicine, Committee on Defining and Revising an Essential Health Benefits Package for Qualified Health Plans (2011)).

377. Medical providers are ineligible to collect No-Fault payments for medically unnecessary services.

378. The Defendants violated applicable licensing requirements by billing for medically unnecessary services—it is professional misconduct for a physician to (1) order excessive and unwarranted healthcare services not warranted by the condition of the patient; (2) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient; or (3) practice medicine in a fraudulent manner. *See* N.Y. Educ. Law § 6530.

379. Liberty Mutual claimants were subjected to unnecessary services, including surgeries and pain management injections performed under anesthesia.

380. However, the documentation submitted to Liberty Mutual by the Defendants routinely misrepresented that the billed-for services were performed in a legitimate manner.

381. Because of their misconduct, the Defendants violated applicable laws and licensing regulations, and are not eligible to collect No-Fault payments.

382. The Defendants purport to examine, diagnose, and treat Liberty Mutual claimants who are in motor vehicle accidents and complain of neck and back pain.

383. To obtain a legitimate diagnosis, the Defendants must procure and perform a detailed history and a legitimate examination of patients with neck and back pain resulting from motor vehicle accidents.

384. To obtain a legitimate diagnosis, a licensed medical professional must engage in medical decision making to develop a treatment plan tailored to the unique circumstances of each patient.

385. During the course of treatment, treatment plans should be periodically reassessed based on the unique circumstances of each patient's response to treatment.

386. When a patient presents with a soft-tissue or disc injury after a motor vehicle accident, such as a sprain, strain, disc bulge, or herniation, conservative treatment should be recommended.

387. Treatment plans for patients with strains, sprains, bulges, and herniations may involve no further treatment whereas these injuries often resolve over a period of weeks through conservative care.

388. In a legitimate clinical setting, interventional pain management treatment should not be administered until a patient has attempted conservative care.

389. Invasive pain management treatments, including injections and surgery, involve a degree of risk to the patient.

390. The examination, diagnosis, and treatment of patients must be properly documented for use by: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient; (c) payors such as Liberty Mutual so it can adjust the resulting bills.

## 1. Treatment Protocol

391. The healthcare services billed by the Defendants to Liberty Mutual were not medically necessary because they were provided pursuant to a fraudulent predetermined treatment protocol designed to obtain Liberty Mutual claimants' insurance benefits.

392. After obtaining the unlawful referral from the Referral Clinics, the Defendants implemented their predetermined treatment protocol.

393. The Defendants' predetermined treatment protocol consisted of sham initial evaluations by nurse practitioners that did not legitimately obtain the required medical histories, examine, and diagnose Liberty Mutual claimants.

394. These cursory examinations were used to falsely justify medically unnecessary diagnostic procedures, injections, and surgeries to extract the most money from the Liberty Mutual claimants' benefits.

395. Nearly every claim involved a low-impact injury wherein the mechanism of injury does not correlate with the Defendants' documented findings.

396. The Defendants' documentation was formulaic whereby each Liberty Mutual claimant suffered from a weakness of decreased sensation.

397. A true and accurate example of formulaic Defendant documentation is depicted below:

> **Neuro:** ORIENTATION: Alert & oriented x 3. The patient understood command well. Attention span and concentration were normal. Remote and Recent memory were normal. There is no deficits in cranial nerves I – XII. MOOD & AFFECT: No depression, anxiety or agitation noted. TEST COORDINATION/GAIT: Normal coordination. Abnormal Gait. EXAM OF DTR: Abnormal 1+ BUE and BLE DTR. Reflexes are decreased in the BUE and BLE. EXAM OF SENSATION: Decreased to light touch in the BUE and BLE. Decreased to pinprick in the BUE and BLE.

398. The Defendants used the referral from the Referral Clinics and the subsequent spurious examination to justify the unnecessary services, including injections and surgeries.

399. In many instances, according to the records submitted to Liberty Mutual, these claimants' injuries, if any, were nothing more than sprains or strains from which a patient would generally recover within approximately six (6) to twelve (12) weeks.

400. However, the examinations billed to Liberty Mutual by PARS Medical misrepresented facts about the patients' alleged injuries.

401. The Defendants utilized a predetermined protocol of treatment through which all patients were prescribed highly similar healthcare services that were designed to maximize the amount of the bills submitted to Liberty Mutual.

402. This predetermined protocol did not take into consideration each individual patient's medical needs, injuries, or comorbidities, but instead was designed to generate charges as quickly as possible regardless of clinical justification.

403. Kreizman, who is a pain management physician, frequently mischaracterized the procedures allegedly done to the patients at issue herein as "surgeries" in order to create the appearance of significance and of injuries that were more severe than they actually were.

404. In many cases, Kreizman referred to CADS Anesthesia and Suede to provide anesthesia to patients who did not require anesthesia to reinforce the appearance of major surgery and to artificially inflate the value of the Defendants' claims to Liberty Mutual.

405. In some instances, the diagnoses were inconsistent with the findings of the purported examination of the patient.

406. Procedure orders were prematurely determined—sometimes just weeks after the accident—before the patients even had a chance to recover on their own.

407. Overall, the services purportedly rendered through PARS Medical and CADS

Anesthesia created a false justification for medically unnecessary—and excessively charged—pain management procedures.

408. The Defendants' goal was to bill as much as possible, regardless of whether treatment was reasonably necessary to patients' care, recovery, or rehabilitation, in order to generate bills for submission to Liberty Mutual.

409. To maximize their financial gain, the Defendants adhered to a predetermined protocol of unnecessary, indiscriminate, and excessive treatment and testing, as discussed more fully below.

410. The Defendants' purported treatment violated standards of care in the medical community, as the vast majority of testing, diagnostics, referrals, procedures, and treatment were not medically indicated, and were redundant, excessive, and repeated without any benefit to patients.

411. The full extent and pattern of the Defendants' misrepresentations regarding the lawfulness and necessity of the treatment they billed was not known to Liberty Mutual until it undertook the full investigation that culminated in the filing of this action, including identification of the Defendants' pattern of fraudulent conduct.

412. The unnecessary treatment billed by the Defendants, discussed more fully below, includes the treatment and patients set out in the charts annexed hereto at Exhibits 1-6.

413. All of the bills generated by the Defendants and mailed to Liberty Mutual seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

414. Liberty Mutual is not required to pay the Defendants for treatment that was medically unnecessary and it is entitled to the return of money it was induced to pay as a result of the Defendants' fraud.

### 2. Medically Unnecessary Injections

415. The Defendants billed Liberty Mutual for injections that were medically unnecessary, if they were performed at all.

416. The performance of invasive procedures, including injections, must be based upon an adequate diagnosis and a legitimate documented medical necessity.

417. The Defendants inexplicably billed for injection procedures that are intended to be used for diagnostic purposes without using information gleaned from such procedures for any purpose.

418. Consequently, patients received unjustified invasive procedures that offered little therapeutic or diagnostic efficacy while subjecting the patients to unnecessary risks of infection.

419. Liberty Mutual claimants treating with PARS Medical were almost invariably directed to undergo pain management injections.

420. The Defendants pushed these injections even when the patient had not yet attempted conservative treatment, when the patients had improved with conservative treatment (which was routinely falsified by the Defendants), and where there had not been sufficient time since the patient's alleged accident to permit the normal and expected minor pain and soreness from the accident to resolve, which is contrary to the accepted standard of care.

421. For example, claimant M.B. (claim no. 051259821) was recommended to undergo trigger point injections on October 21, 2022 despite being in a motor vehicle accident just three days earlier on October 18, 2022.

422. A true and accurate example of claimant M.B. being recommended pain management injections during the initial visit with PARS Medical is depicted below:

Patient: M[redacted] B[redacted]
DOB: [redacted]970
Date: 10/21/2022
Attending: Isaac Kreizman, M.D.

## NEW PATIENT

**CHIEF COMPLAINT:**
Lower back and neck pain.

**HISTORY OF PRESENT ILLNESS:**
M[redacted] B[redacted] is a 52-year-old woman who was involved in an accident; the details of the accident have been discussed with the patient. According to the information presented, the patient was in a regular state of good health and was capable of living on an equal basis with others of her age, before being involved in a motor vehicle accident, when all of her symptoms began. The patient was the driver of the vehicle that was rear ended during the accident that occurred on 10/18/2022. Patient followed up with doctor, post-accident. As a result of the impact, the patient sustained injuries to the lower back and neck. Patient is currently undergoing treatments of physical therapy and taking NSAIDs and Topical analgesics. Level of pain is currently rated a 9-10/10 in the lower back and 8-9/10 in the neck. Symptoms are described as being constant, sharp, and stabbing in nature along with stiffness and spasms. The back pain radiates down into the lower extremities along with numbness and tingling sensations, causing muscle weakness and decreased ranges of motion. The neck pain radiates down into the upper extremities along with numbness and tingling sensations, causing muscle weakness and decreased ranges of motion. Symptoms are exacerbated the most by any swift or sudden neck movements, lifting, reaching overhead, lying down at night, bending, standing, and walking. Patient's ability to sleep, transfer from sit to stand positions, as well as perform activities of daily living, such as self-care, household tasks, and personal errands is decreased from normal, secondary to having increased pain symptoms. Patient's overall quality of life is negatively affected by having persistent pain symptoms which limits her mobility, muscle strength and ability to function with ease.

**PLAN:**

1. After the examination, the patient was advised that because of the sustained injuries no heavy work should be performed until next evaluation. Patient's MRI's are pending. On the basis of medical history presented by the patient and the physical examination findings, it is in my opinion to reasonable degree of medical certainty, that the condition described above is related to the above-mentioned incident.
2. Based upon the subjective complaints and medical evaluation the objective findings, the following test are indicated MRI of the Lumbar and Cervical spine, in order to determine the severity of her injuries post-accident. These MRI's are pending. MRI films are required in order to determine the best course of treatment.
3. After reviewing patient's history, physical examination and all MRI films, I do believe the patient is a good candidate for Trigger Point steroid injection treatment to the lumbar spine. Patient was highly recommended to undergo this procedure (with all the risks and benefits discussed) to help treat the myalgia and lower back pain. Patient will benefit from this treatment, as it will help to decrease the pain and increase overall quality of life. After our discussion, the patient verbalized wanting to undergo the above-mentioned procedure today.

423. As discussed herein, the Defendants also pressured patients to undergo injections even when prior injections billed by the Defendants were not helpful or were actually harmful to the patient.

424. The Defendants' practice of pressuring patients to submit to injections immediately following claimed accidents, even when conservative treatment had not been attempted or had

been successful and when prior injections proved ineffective or harmful, resulted in injections that were medically unnecessary and excessive.

425. Kreizman testified that pain management should only be used if a patient fails conservative measures.

426. A true and accurate excerpt from the Examination Under Oath of Kreizman is depicted below:

> A Sure, sure, sure. So pain medicine entails being able to diagnose a patient to see if a patient had failed conservative measures, if they failed physical therapy, if they failed medications, be it muscular medication, anti-inflammatories or opioids, as much as we try not to prescribe opioids sometimes we do have to write opioids and then when patients fail conservative measures, to do interventional procedures.

### 3. Unnecessary Epidural Steroid Injections

427. PARS Medical routinely billed Liberty Mutual for unnecessary epidural steroid injections ("ESI").

428. The Defendants billed Liberty Mutual for spinal ESI and trigger point facet injections.

429. ESIs are simple injections of a steroid solution that take just a few minutes to perform and can and should be performed in a doctor's office with a local anesthetic absent unique

circumstances that must be documented in a patient's record.

430. ESIs are indicated when a patient has radicular symptoms that are confirmed by a thorough and appropriate neurologic evaluation, and are intended to be diagnostic and therapeutic.

431. All of the PARS Medical bills for unnecessary ESI pursuant to CPT Codes 62321, 62323, 64479, 64480, 64483, and 64484 are fraudulent, including those identified in Exhibit 1.

### 4. Unnecessary Facet Joint Injections

432. PARS Medical routinely billed Liberty Mutual for unnecessary facet joint injections.

433. Facet injections, which are also simple injections of a steroid solution that also take minutes to perform and can and should be done in a doctor's office absent unique circumstances, are indicated when a patient has axial (i.e., non-radiating) pain, and are purely diagnostic as any pain relief from such injections is short-lived.

434. Facet joint injections are intended to diagnose facet generated pain and aid in the decision of whether to proceed to longer lasting treatments, such as rhizotomies.

435. Facet joint injections typically are not expected to result in any long-term relief and do not need to be repeated once the diagnostic information from the first injection is obtained.

436. All of the Defendants' billing for unnecessary facet joint injections pursuant to CPT Codes 64490-64494 are fraudulent, including those identified in Exhibit 2.

### 5. Trigger Point Injections

437. PARS Medical routinely billed Liberty Mutual for unnecessary trigger point injections.

438. A trigger point injection is a simple injection of a local anesthetic (sometimes accompanied by a steroid) directly into a trigger point.

439. Trigger points are discrete palpable taut muscle bands that are painful when palpated.

440. The definition of a trigger point requires the triggering of the pain with palpation.

441. The performance of trigger point injections is part of the Defendants predetermined treatment protocol.

442. Simply seeing a tight muscle on an ultrasound does not qualify as a trigger point.

443. The Defendants routinely billed Liberty Mutual for CPT code 76942 (ultrasonic guidance procedure) used in connection with injections.

444. A true and accurate excerpt from the Examination Under Oath of Kreizman is depicted below:

> Q So do you ever use ultrasonic guidance for steroidal injections or any other type of procedure?
>
> A No, no. Usually I've used -- I use sonograms not for epidurals, I use sonograms. When I do trigger point injections, I'll use a sonogram machine.

445. A true and accurate example of CPT code 76942 being unnecessarily billed in connection with injections is depicted below:

| | 24. A. DATE(S) OF SERVICE From MM | DD | YY | To MM | DD | YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 10 | 26 | 22 | 10 | 26 | 22 | 11 | | 99203 | 25 | AB | 142 62 | 1 | | NPI | 1598416927 |
| 2 | 10 | 26 | 22 | 10 | 26 | 22 | 11 | | 20553 | | AB | 131 01 | 1 | | NPI | 1598416927 |
| 3 | 10 | 26 | 22 | 10 | 26 | 22 | 11 | | 76942 | 26 | AB | 289 20 | 1 | | NPI | 1598416927 |
| 4 | N400003049420 ML1 | | | | | | | | | | | | | | | |
| | 10 | 26 | 22 | 10 | 26 | 22 | 11 | | J3301 | | AB | 96 00 | 4 | | NPI | 1598416927 |
| 5 | | | | | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER [redacted] SSN EIN [X]
26. PATIENT'S ACCOUNT NO. 46292323656
27. ACCEPT ASSIGNMENT? (For govt. claims, see back) [X] YES NO
28. TOTAL CHARGE $ 658 83
29. AMOUNT PAID $ 0 00
30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
Signature on File
GREGORY ABRAMOV, NP
SIGNED 11/14/22 DATE

32. SERVICE FACILITY LOCATION INFORMATION
PARS MEDICAL, PC
3077 HYLAN BLVD.
STATEN ISLAND, NY 10306-4113
a. 1972723773 b.

33. BILLING PROVIDER INFO & PH # (718) 431-2959
PARS MEDICAL PC
PO BOX 28675
NEW YORK, NY 10087-8675
a. 1972723773 b.

446. Ultrasonic guidance has no medical necessity since the taut band can be felt.

447. The use of ultrasonic guidance here has no purpose other than to artificially inflate the charges to Liberty Mutual.

448. All of the Defendants' billing for unnecessary trigger point injections pursuant to CPT Codes 20553 are fraudulent, including those identified in Exhibit 3.

449. All of the Defendants' billing of ultrasonic guidance pursuant to CPT code 76942 are fraudulent, including those identified in Exhibit 3.

450. Therefore, the bills for interventional pain management procedures are fraudulent and not compensable under New York law because the services were not medically necessary.

### 6. <u>Medically Unnecessary Percutaneous Discectomies</u>

451. After making the false and exaggerated diagnoses detailed above, the Defendants subjected their patients to invasive procedures, including several that they characterized as "surgeries" in order to bill tens and sometimes hundreds of thousands of dollars for purported services that took mere minutes to perform.

452. These "surgeries," to the extent they were performed at all, were misused, not

medically indicated, and premised on false representations about patients' injuries, treatments, and responses to prior interventions.

453. A percutaneous discectomy is a surgical procedure for patients with radicular pain stemming from a contained disc protrusion (nucleus pushes against the disc, through the annulus and causes the disc to protrude into the spinal column), which is a specific type of disc herniation.

454. A percutaneous discectomy is performed by placing a needle into the middle of the problematic spinal disc and removing a small amount of disc tissue to create empty space inside the disc to allow the disc to collapse on itself (i.e., allow the disc to decompress).

455. In total, a single disc procedure performed by an experienced medical practitioner takes between 10 and 30 minutes from the time the needle is inserted until the time it is removed.

456. Percutaneous discectomy is not universally recognized by the medical community to result in any meaningful decompression or pain relief.

457. Percutaneous discectomies are less indicated in the cervical spine than in the lumbar spine because the anatomy of the cervical spine and of the cervical discs themselves makes percutaneous access riskier.

458. The Defendants performed both lumbar and cervical percutaneous discectomies without satisfying the requisite clinical and radiographic criteria.

459. In addition to improperly recommending and performing percutaneous discectomies, the Defendants also submitted bills for percutaneous discectomies that were fraudulent.

460. According to the American Academy of Professional Coders, CPT code 63075 describes traditional/open discectomies, and CPT code 62287 applies only to percutaneous discectomies performed on the lumbar spine.

461. There is no CPT code for a cervical percutaneous discectomy, and as such, a

cervical percutaneous discectomy should be billed using an unlisted procedure code 64999 (unlisted procedure, nervous system).

462. Instead of properly billing for cervical percutaneous discectomies using CPT code 64999, the Defendants billed using CPT code 63075—which represents an open spine (or traditional) discectomy procedure, not a percutaneous (or non-invasive) discectomy procedure.

463. Open discectomies may involve inpatient hospital stays while percutaneous discectomies are typically an outpatient procedure.

464. Kreizman testified that the percutaneous discectomies are non-invasive.

465. A true and accurate excerpt from the Examination Under Oath of Kreizman is depicted below:

> Q So you perform invasive procedures at your two PARS locations, meaning like cutting people open, blood loss, things like that?
>
> A Well, the good thing about pain management is we don't see much blood loss. So we are able to perform things like, you know, what a pain management practitioner does, you know, like epidural injections, facet injections, radio frequency ablation, discectomies. None of that requires cutting anyone open or doesn't require any type of blood or blood transfusion for that.
>
> You know, those again would have to be performed in a hospital type of setting.

466. Accordingly, the surgical decompression procedures defined by CPT codes 63075 are completely different procedures than the cervical percutaneous discectomies performed by the Defendants.

467. Because CPT code 63075 represents a more complicated and serious open discectomy, they must be billed separately.

468. The Defendants intentionally billed Liberty Mutual for more complicated

procedures that were never performed.

469. All of the billing for unnecessary percutaneous discectomies pursuant to CPT Codes 62287 and 63075 is fraudulent, including those identified in Exhibit 4.

470. Further, when billing for lumbar and cervical percutaneous discectomies under CPT codes 62287 (lumbar) and 63075 (cervical), the Defendants also often bill for percutaneous intradiscal electrothermal annuloplasty ("IDET") (CPT codes 22526 and 22527) and diagnostic procedures that are not actually being used as diagnostic tools to advance the Liberty Mutual claimants' treatment (CPT code 62290 for discographies and CPT code 72275 for epidurographies).

471. The IDET procedure billed by PARS Medical is ineffective and unnecessary.

472. All of the billing for IDET by PARS Medical pursuant to CPT Codes 22526 and 22527 is fraudulent, including those identified in Exhibit 5.

473. Lastly, the Defendants often billed Liberty Mutual for multiple physicians during the percutaneous discectomy procedure.

474. This is entirely unnecessary whereas only 1 physician can operate the device and there is no need for a second physician.

475. All of the fraudulent bills to Liberty Mutual for percutaneous discectomy procedures to Liberty Mutual claimants were sent through the U.S. Mail.

476. All of the percutaneous discectomy procedures billed by the Defendants in connection with Liberty Mutual claimants are fraudulent, including those identified in Exhibits 4-5.

**7. <u>Improper Use of Epidurography</u>**

477. As part of the predetermined treatment protocol, PARS Medical fraudulently billed Liberty Mutual for epidurography pursuant to CPT code 72275.

478. An epidurography is a radiologic study of a portion of a patient's spine that is performed by imaging and documenting the flow of contrast dye injected into the patient and observed using fluoroscopy.

479. An epidurography is an uncommon diagnostic test that is usually indicated only when an MRI or CT scan cannot be obtained or is somehow insufficient.

480. When minor pain procedures such as a steroid injection or nerve block are performed with fluoroscopic guidance, contrast dye is injected to help guide the placement of the needle. This is not an epidurography. It is merely a component of the injection procedure and is not separately billable.

481. When the Defendants billed for injection procedures, they often also billed for an epidurography that they never actually performed. They did not document the flow of the contrast dye and did not issue formal radiologic reports. The Defendants merely used contrast dye (if at all) to guide the injection needle and then falsely claimed to have also performed an epidurography solely to create the appearance of justification for their outrageous charges.

482. A true and accurate excerpt from the Examination Under Oath of Kreizman is depicted below:

Q Now, what would the clinical indication for epidurography be?
A It would be the same for an epidural. So it's just an extra -- it's an extra procedure that's performed for a patient that requires an epidural injection.

Q I'm not sure I understand your answer.

A So if that patient had epidurography, that means that I also did an epidural injection for that patient, which means that I would have an MRI to

show me at which level to inject the patient.

483. For example, PARS Medical billed for an alleged epidurography of patient A.H. (claim no. 056561149) on May 14, 2024.

484. A true and accurate example of the PARS Medical bill for A.H. on date of service May 14, 2024 is depicted below:

| | 24. A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 05 14 24 05 14 24 | 24 | | 62321 | | AB | 503 88 | 1 | | NPI | 1497825434 |
| 2 | 05 14 24 05 14 24 | 24 | | 72275 | 26 | AB | 460 86 | 1 | | NPI | 1497825434 |
| | N400003049420 ML1 | | | | | | | | | | |
| 3 | 05 14 24 05 14 24 | 24 | | J3301 | | AB | 96 00 | 4 | | NPI | 1497825434 |
| 4 | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. Rsvd for NUCC Use |
|---|---|---|---|---|---|
| [redacted] EIN X | 54564323656 | X YES NO | $ 1060 74 | $ 0 00 | |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) | 32. SERVICE FACILITY LOCATION INFORMATION | 33. BILLING PROVIDER INFO & PH # (718) 431-2959 |
|---|---|---|
| Signature on File ISAAC KREIZMAN, MD SIGNED 05/28/24 DATE | SURGICARE OF BROOKLYN 313 43RD STREET BROOKLYN, NY 11232-3609 a. 1639689250 b. | PARS MEDICAL PC PO BOX 28675 NEW YORK, NY 10087-8675 a. 1972723773 b. |

485. On this date, PARS Medical billed for a cervical ESI while also separately (and improperly) billing for epidurography.

486. The epidurography allegedly performed was not supported by formal radiologic reports.

487. A.H. had previously received an MRI of the cervical spine less than one month before the injection, which the Defendants knew about and purportedly used as the basis for why injections were medically indicated.

488. Notably, CPT code 72275 was deleted effective January 1, 2022, when it was bundled into the procedures.

489. The Defendants billed for deleted CPT code 72275, including all of the dates identified in Exhibit 6.

490. All of the billing for unnecessary epidurography pursuant to CPT code 72275 was fraudulent, including all of the dates of service in Exhibit 6.

### 8. Medically Unnecessary Intradiscal Electrothermal Annuloplasty

491. The Defendants fraudulently billed for IDET pursuant to CPT codes 22526 and 22527.

492. An IDET is a minimally invasive procedure to treat low back pain caused by either a disc injury where the nucleus moved to the outer layers of the disc (thereby irritating the outer layers), or where nerve fibers that have grown out from the outer layers into the disc interior as a result of degeneration of the annulus.

493. IDETs use thermal energy to disrupt the nerve endings within the disc, destroy the nerve fibers, and toughen the disc tissue, sealing any small tears.

494. Before an IDET procedure, the patient is given a sedative and a local anesthetic. Then, using fluoroscopy, a physician inserts a hollow needle containing a catheter and heating

element into the disc, positioned in a circle in the annulus, and then slowly heats the needle.

495. In total, a single disc procedure performed by an experienced medical practitioner takes approximately 25 minutes from the time the needle is inserted until the time it is removed.

496. The vast majority of the medical community abandoned the procedure more than a decade ago.

497. In 2008, the Centers for Medicare & Medicaid Services ("CMS") issued a national coverage determination ruling IDET procedures are not reasonable and necessary for the treatment of low back pain performed on Medicare beneficiaries. Since that time, private insurance companies have adopted similar coverage recommendations, and it is not a commonly performed medical procedure for any indication or any patient. It is also not a covered procedure, and s such, hospitals largely do not perform the procedure.

498. Nevertheless, the Defendants billed Liberty Mutual for IDETs on Liberty Mutual claimants without medical justification and to maximize the Defendants' financial gain.

499. None of the Defendants' IDET billing that was sent to Liberty Mutual through the U.S. Mail is compensable.

500. All of the bills submitted by the Defendants for IDET procedures are fraudulent, including all dates of service identified in Exhibit 5.

### D. FRAUDULENT BILLING

501. The Defendants billed Liberty Mutual using Current Procedural Terminology ("CPT") codes.

502. CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of medical charges by insurance carriers and other private and governmental healthcare payors.

503. Reimbursement for medical services is directly proportionate to the level of the

CPT code billed (i.e., the higher the level of CPT code billed, the greater the amount of reimbursement).

504. The Defendants' bills were fraudulent because they were excessive, and because they misrepresented the services actually provided (if at all).

505. The Defendants engaged in unbundling when it submitted bills under CPT code 77003 (fluoroscopic guidance).

506. Fluoroscopic guidance is integral to the codes used for techniques such as ESI and facet blocks, and thus should not be reported separately from such procedures.

507. For example, CPT codes 64479-64484 applicable to transforaminal epidural steroid injections specifically state that they are used to report such procedures performed "with imaging guidance (fluoroscopy or CT)."

508. However, the Defendants billed Liberty Mutual separately for fluoroscopic guidance in connection with procedures that specifically include fluoroscopic guidance in a deliberate attempt to generate excessive charges. *See* Exhibit 1.

| Claim No. | DOL | Claimant Initials | Billing Provider | Date of Service | Unbundled CPT Codes |
|---|---|---|---|---|---|
| 041492968-0001 | 12/1/2019 | A.W. | PARS Medical PC | 6/11/2020 | 64479<br>64480 |
| 041329930-0001 | 10/28/2019 | B.Y. | PARS Medical PC | 7/2/2020 | 64479<br>64480 |
| 039017640-0001 | 1/11/2019 | B.F. | PARS Medical PC | 6/25/2020 | 64483<br>64484 |
| 042980266-0001 | 7/6/2020 | D.H. | PARS Medical PC | 12/22/2020 | 64483<br>64484 |
| 038341153-0003 | 9/28/2018 | E.F. | PARS Medical PC | 4/4/2019 | 64483<br>64484 |
| 041055527-0003 | 9/17/2019 | E.M. | PARS Medical PC | 3/16/2020 | 64483<br>64484 |
| 041440479-0005 | 11/24/2019 | J.R. | PARS Medical PC | 8/20/2020 | 64483<br>64484 |

| Claim No. | DOL | Claimant Initials | Billing Provider | Date of Service | Unbundled CPT Codes |
|---|---|---|---|---|---|
| 043191818-0004 | 8/2/2020 | K.M. | PARS Medical PC | 2/10/2021 | 64483<br>64484 |
| 033647292-0005 | 4/23/2016 | M.V. | PARS Medical PC | 9/14/2016 | 64483<br>64484 |
| 033647292-0005 | 4/23/2016 | M.V. | PARS Medical PC | 11/3/2016 | 64483<br>64484 |
| 041815521-0001 | 1/4/2020 | P.S. | PARS Medical PC | 6/1/2020 | 64483<br>64484 |
| 041965151-0003 | 2/5/2020 | R.D. | PARS Medical PC | 5/14/2020 | 64483<br>64484 |

509. None of the Defendants unbundled charges for fluoroscopic guidance that was sent through the U.S. Mail is compensable.

510. All of the bills submitted by the Defendants for unbundled fluoroscopic guidance are fraudulent, including all dates of service identified in Exhibit 1.

### E. Illegal Billing for Independent Contractors

511. PARS Medical's representations about the actual provider of the billed-for services are material because under New York law, a medical provider operating as a PC is only eligible for compensation if the billed-for services are provided by an owner or employee of the PC.

512. If a PC uses independent contractors, instead of employees, to provide medical services, then the PC is not eligible to seek or collect payment under New York's No-Fault Laws. *See* DOI Opinion Letters at Exhibit 7.

513. Under New York's No-Fault laws, professional service entities are only eligible for compensation if the billed-for services are provided by an owner or employee of the company.

514. A healthcare provider's use of independent contractors, instead of employees, to provide healthcare services renders the provider ineligible to receive reimbursement under the No-Fault laws.

515. If the professional service entity retains a provider as an independent contractor rather than an employee and that contracted-provider renders services top patients, then the professional service entity is not permitted to seek payments under New York's No-Fault laws for the services rendered by the contracted-provider.

516. Although Kreizman claims that the nurse practitioners are full-time employees, the degree of control exercised by PARS Medical was insufficient to give rise to an employer-employee relationship.

517. The relevant factors to assessing control include whether the nurse practitioner (1) worked at his/her convenience; (2) was free to engage in other employment; (3) received fringe benefits; (4) was on the employer's payroll; and (5) was on a fixed schedule.

518. The nurse practitioners at PARS Medical worked at their convenience and often had other employment in addition to PARS Medical.

519. A true and accurate excerpt from the Examination Under Oath of Kreizman is depicted below:

Q Do you know if any of your medical professionals who work for PARS, if they work for any other medical practices?

A I know that they work like at urgent care centers and some are working in the hospital settings as well.

MS. RUTIGLIANO: At the same time?

THE WITNESS: Yeah. So they may do a few days a week with me and then they'll cover urgent care centers or hospitals some of the other time as well.

Q Does Alex Khaimov work for you full-time or does he do work for any other medical professionals?

A So Alex Khaimov, he works

part-time a few days a week and he also works for another facility. I believe it's like an urgent care type of center.

Q But it's not a fixed schedule, like he works Monday through Friday 9:00 to 5:00 at PARS Medical; is that correct?

A Correct.

Q My question for you would be does Greg Abramov work based on like the needs of the other facilities where he might see patients?

A Yes, yes. So he'll, you know, he'll have a schedule based on the need of where he needs to be or where he needs to go.

Q So again that's based on like the need to go treat patients and not necessarily like a 9:00 to 5:00; right?

A Yeah. That's correct.

Q Irina Matatova, does she work exclusively for PARS Medical?

A Yeah. She works maybe three days a week, two or three days a week. She has a child. I think she has two kids, so she only wants to work part-time. She's not able to really work full-time.

Q And is her schedule similar to Greg Abramov insofar as she might as a nurse practitioner be traveling to different facilities to see patients and it's based on the patient flow as opposed to a fixed schedule?

A That is correct.

Q Shlomo Bauman. Shlomo Bauman is a nurse practitioner; is that right?

A That is correct.

Q And Shlomo Bauman, when did Shlomo Bauman start working for you?

A I believe also two or three years ago. Two or three years ago I believe.

Q Does he work exclusively for PARS?

A No. He also works maybe

three days a week and he also I believe covers urgent cares, hospitals, outside or like primary care type, yeah.

Q And is it fair to say that Shlomo Bauman, Alex Khaimov, Greg Abramov, oh, excuse me, Shlomo Bauman, Alex Khaimov and Irina Matatova, these nurse practitioners, that they share the fact that they don't work on a set schedule, they work based on the patient needs and the facility's needs where they go to see patients?

A That's correct, yeah.

Q Who sets that work schedule you talked about?

A Yeah. Michael Garbulsky, my physician assistant, he puts together a schedule for the nurse practitioners.

520. Upon information and belief, PARS Medical did not provide meaningful benefits to the nurse practitioners.

521. A true and accurate excerpt from the Examination Under Oath of Kreizman is depicted below:

Now, of these employees that we've just talked about, are they covered

under your Workers' Compensation policy for PARS?

A Again, I'm not sure. I know Justworks removes, you know, things like Medicare, Medicaid, Workman's Comp, so, you know, I'm not sure how they remove or what they remove, but, you know --

Q So I had another question. I lost it in the ether. Hold on.

Oh, you mentioned that these nurse practitioners and physician assistants sometimes, if not always, travel to other locations; is that right?

A That's correct.

Q Are they compensated for their travel time?

A I don't think -- I don't think they are. I don't think they are.

Q So, sir, does PARS Medical cover all of the medical professionals under its malpractice policy?

MS. RUTIGLIANO: I am objecting to this question. Don't answer it.

MR. BRADY: The reason I'm

asking the question is because the witness has testified that all of his employees are W2 employees, correct?

MS. RUTIGLIANO: Correct.

MR. BRADY: So in New York, under No-fault law the analysis relative to independent contractors versus W2s includes an analysis as to whether or not those medical professionals are covered under Workers' Compensation policies, malpractice policies and other policies.

I do believe that there's a foundational basis for the question and I do believe you should answer.

MS. RUTIGLIANO: And I'm going to object and direct him not to answer.

522. PARS Medical refused to provide Liberty Mutual with the malpractice policy covering the nurse practitioners, if any.

523. Although PARS Medical categorized the nurse practitioners as full-time employees, they were in reality independent contractors.

524. All of the billing by PARS Medical submitted to Liberty Mutual through the U.S. Mail for services provided by independent contractor nurse practitioners was fraudulent.

## V. SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

525. Throughout the course of this entire scheme, the Defendants (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

526. Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, letters, NF-3's and invoices in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

527. Every automobile insurance claim detailed within this Complaint involved at least two uses of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claim-related payments, and the return of the cancelled payment instruments to the financial institution(s) from which the draft(s) were drawn.

528. The Defendants either personally used (or caused the use of) the U.S. Mail to

further this fraudulent scheme by causing patient medical records, prescriptions, bills, invoices, and other No-Fault claim documents from PARS Medical to be mailed to Liberty Mutual, or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

### A. PARS MEDICAL ENTERPRISE

529. Kreizman, Garbulsky, Suede, and CADS Anesthesia either personally used the U.S. Mail to further this fraudulent scheme by causing false medical documentation from PARS Medical to be mailed to Liberty Mutual and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

530. Kreizman, Garbulsky, Suede, and CADS Anesthesia caused PARS Medical to falsely certify that it was, in all respects, eligible to be reimbursed each time that PARS Medical mailed a demand for payment (i.e., invoice) to Liberty Mutual.

531. Because PARS Medical was not lawfully eligible to seek or collect No-Fault benefit payments, Kreizman, Garbulsky, Suede, and CADS Anesthesia caused PARS Medical to make a misrepresentation each and every time that PARS Medical mailed a document to Liberty Mutual claiming eligibility for reimbursement.

532. Moreover, because (a) PARS Medical was not lawfully eligible to seek or collect No-Fault benefit payments , (b) Kreizman, Garbulsky, Suede, and CADS Anesthesia caused PARS Medical to seek No-Fault reimbursement from Liberty Mutual, and (c) PARS Medical used the U.S. Mail to seek reimbursement, it is clear that the Defendants committed mail fraud.

533. The Defendants further engaged in unlawful and improper self-referral practices when obtaining referrals of Liberty Mutual claimants from the Referral Clinics in violation of applicable law, which further rendered PARS Medical ineligible for No-Fault reimbursement.

534. At all relevant times, the Defendants knew that PARS Medical, a patient, a claimant, an insurance carrier, patient’s attorney, other medical provider, and/or Liberty Mutual

would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by PARS Medical.

535. Liberty Mutual estimates that the unlawful operation of the Referral Clinics generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 8 and incorporated by reference as if set forth in its entirety.

### B. CADS ANESTHESIA ENTERPRISE

536. Kreizman, Suede, and PARS Medical either personally used the U.S. Mail to further this fraudulent scheme by causing false medical documentation from CADS Anesthesia to be mailed to Liberty Mutual and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

537. Kreizman, Suede, and PARS Medical caused CADS Anesthesia to falsely certify that it was, in all respects, eligible to be reimbursed each time that CADS Anesthesia mailed a demand for payment (i.e., invoice) to Liberty Mutual.

538. Because CADS Anesthesia was not lawfully eligible to seek or collect No-Fault benefit payments, Kreizman, Suede, and PARS Medical caused CADS Anesthesia to make a misrepresentation each and every time that CADS Anesthesia mailed a document to Liberty Mutual claiming eligibility for reimbursement.

539. Moreover, because (a) CADS Anesthesia was not lawfully eligible to seek or collect No-Fault benefit payments , (b) Kreizman, Suede, and PARS Medical caused CADS Anesthesia to seek No-Fault reimbursement from Liberty Mutual, and (c) CADS Anesthesia used the U.S. Mail to seek reimbursement, it is clear that the Defendants committed mail fraud.

540. The Defendants further engaged in unlawful and improper self-referral practices when obtaining referrals of Liberty Mutual claimants from the Referral Clinics in violation of

applicable law, which further rendered CADS Anesthesia ineligible for No-Fault reimbursement.

541. At all relevant times, the Defendants knew that CADS Anesthesia, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, and/or Liberty Mutual would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by CADS Anesthesia.

542. Liberty Mutual estimates that the unlawful operation of the Referral Clinics generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 9 and incorporated by reference as if set forth in its entirety.

## VI. SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY LIBERTY MUTUAL

543. The Defendants falsely certified that PARS Medical and CADS Anesthesia was eligible to be reimbursed as a means to induce Liberty Mutual to promptly pay charges related to healthcare services purportedly provided to Liberty Mutual claimants.

544. Indeed, the Defendants attested to the medical necessity of the services that they allegedly performed as well as the validity of the charges for such services.

545. The Defendants were legally obligated to act honestly and with integrity, and were also legally obligated to act in accordance with every aspect of their oath as licensed physicians.

546. The Defendants caused PARS Medical and CADS Anesthesia to submit to Liberty Mutual documents and bills for (a) services that were not provided; (b) services that involved unlawful referrals, undisclosed financial arrangements, and kickbacks; (c) services that were not medically necessary; and (d) charges that exceeded the amounts allowed under the applicable Fee Schedule.

547. Such conduct is unlawful.

548. Many of the unlawful acts are not readily evidenced within the four corners of the documentation submitted to Liberty Mutual by the Defendants and upon which Liberty Mutual relied in adjusting the claims and tendering payment in connection with each discrete patient claim.

549. Claims submitted by the Defendants to Liberty Mutual can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

550. Thus, every time that the Defendants submitted billing to Liberty Mutual by PARS Medical and CADS Anesthesia, they certified that the Defendants were eligible to be reimbursed.

551. The Defendants' purposeful concealment of the lack of eligibility for No-Fault reimbursement allowed the scheme to continue undetected.

552. Consequently, the full extent of the Defendants' fraudulent acts relative to their operation of PARS Medical and CADS Anesthesia was not, and could not have been, known to Liberty Mutual until shortly before it commenced this action.

## VII. LIBERTY MUTUAL'S JUSTIFIABLE RELIANCE

553. Claims submitted to Liberty Mutual by the Defendants was verified pursuant to Insurance Law § 403.

554. To induce Liberty Mutual to promptly pay PARS Medical and CADS Anesthesia, the Defendants submitted NF-3, CMS-1500, or CMS-1450 forms certifying that PARS Medical and CADS Anesthesia were eligible to be reimbursed.

555. Further, to induce Liberty Mutual to promptly pay the fraudulent charges for healthcare services provided to Liberty Mutual claimants, the Defendants hired attorneys and law firms to pursue collection of the fraudulent charges from Liberty Mutual. These attorneys and law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Liberty Mutual in the event that PARS Medical and CADS Anesthesia's charges were not promptly paid

in full.

556. Liberty Mutual is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to Liberty Mutual by PARS Medical and CADS Anesthesia in support of the fraudulent charges, combined with the material misrepresentations described above, were designed to, and did, cause Liberty Mutual to justifiably rely on them.

557. The Defendants concealed from Liberty Mutual the truth regarding PARS Medical and CADS Anesthesia's reimbursement eligibility.

558. In reasonable reliance on these misrepresentations, Liberty Mutual paid money to PARS Medical and CADS Anesthesia to its detriment.

559. Liberty Mutual would not have paid these monies had the Defendants provided true and accurate information about PARS Medical and CADS Anesthesia's reimbursement eligibility, including billing for (a) services that were not provided; (b) services that did not comply with state and local licensure law; (c) services that involved unlawful referrals, undisclosed financial arrangements, and kickbacks; (d) services that were not medically necessary; and (e) charges that exceeded the amounts allowed under the applicable Fee Schedule.

560. As a result, Liberty Mutual was caused to make No-Fault payments totaling over $827,647.42 to PARS Medical and CADS Anesthesia. *See* Exhibits 10-11.

561. Liberty Mutual made payments to PARS Medical and CADS Anesthesia in reasonable reliance on the documents and representations submitted by the Defendants in support of their No-Fault claims, including the (false) warranties that PARS Medical was eligible for payment under New York's No-Fault laws.

## VIII. DAMAGES

562. The Defendants' pattern of fraudulent and unlawful conduct injured Liberty Mutual in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Liberty Mutual to calculate its damages with specificity at this stage of the litigation (whereas Liberty Mutual's damages continue to accrue), Liberty Mutual's injury includes, but is not limited to, compensatory damages for:

A. Payments made to PARS Medical in connection with No-Fault benefit claims totaling over $785,426.21, the exact amount to be determined at trial. The chart annexed at Exhibit 10, and incorporated herein as if set forth in its entirety, identifies Liberty Mutual's payments to PARS Medical in connection with No-Fault benefit claims determined to be fraudulent as of the filing of this Complaint.

B. Payments made to CADS Anesthesia in connection with No-Fault benefit claims totaling over $42,221.21, the exact amount to be determined at trial. The chart annexed at Exhibit 11, and incorporated herein as if set forth in its entirety, identifies Liberty Mutual's payments to CADS Anesthesia in connection with No-Fault benefit claims determined to be fraudulent as of the filing of this Complaint.

## IX. CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### PARS MEDICAL P.C. ENTERPRISE
### (Against CADS Anesthesia Services PLLC, Isaac Kreizman, M.D., Michael Garbulsky, RPA-C, and Charles Suede, M.D.)

563. Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 562 as if set forth fully herein.

564. In furtherance of their operation and management of PARS Medical P.C. ("PARS Medical"), Defendants CADS Anesthesia Services PLLC, Isaac Kreizman, M.D., Michael

Garbulsky, RPA-C and Charles Suede, M.D. (collectively, "Count I Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Liberty Mutual insurance claims, in furtherance of their scheme to defraud.

565. The Count I Defendants employed two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 8.

566. Among other things, NF-3, CMS-1500, and/or CMS-1450 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Liberty Mutual through the U.S. Mail.

567. Policies of insurance were delivered to insureds through the U.S. Mail.

568. Payments made by Liberty Mutual to PARS Medical were delivered through the U.S. Mail.

569. As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3, CMS-1500, and/or CMS-1450 forms, and other claim-related documentation to Liberty Mutual for services that were purportedly performed at PARS Medical for the purpose of collecting payment from Liberty Mutual.

570. As a result of, and in reasonable reliance upon, the mailing of these materially false representations, Liberty Mutual made payment to PARS Medical, for the benefit of one or more of the Count I Defendants, that would not otherwise have been paid.

571. The Count I Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents, each appearing legitimate on their face, also prevented Liberty Mutual from discovering this scheme for a long period of time, thus enabling the Count I Defendants to continue without being detected.

572. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

573. By creating and then mailing to Liberty Mutual (or directing the creation and subsequent mailing to Liberty Mutual) of numerous fraudulent documents in an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

574. The activities alleged in this case had the direct effect of causing funds to be transferred from Liberty Mutual to PARS Medical for the benefit of the Count I Defendants.

575. Liberty Mutual is in the business of writing insurance and paying claims. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Liberty Mutual's overall financial well-being and adversely affect insurance rates.

576. PARS Medical constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

577. The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

578. Liberty Mutual is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property by reason of the Count I Defendants' conduct.

579. The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

580. By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**PARS MEDICAL P.C. ENTERPRISE**
**(Against CADS Anesthesia Services PLLC, Isaac Kreizman, M.D., Michael Garbulsky, RPA-C, and Charles Suede, M.D.)**

581. Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 562 as if set forth fully herein.

582. Throughout their participation in the operation and management of PARS Medical P.C. ("PARS Medical"), Defendants CADS Anesthesia Services PLLC, Isaac Kreizman, M.D., Michael Garbulsky, RPA-C and Charles Suede, M.D. (collectively, "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

583. The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of PARS Medical by means of a pattern of racketeering activity, including numerous instances of mail fraud as set forth in Exhibit 8, and through the preparation and mailing of fraudulent documentation, including NF-3, CMS-1500 and/or CMS-1450 forms, to Liberty Mutual. The purpose of the conspiracy was to obtain No-Fault benefit payments from Liberty Mutual on behalf of PARS Medical, even though PARS Medical, as a result of the Count II Defendants' unlawful conduct, was not eligible to collect such No-Fault benefit payments.

584. The purpose of the conspiracy was also to seek No-Fault benefit payments from Liberty Mutual on behalf of PARS Medical in connection with medical services that were not rendered, falsely reported, not medically necessary, falsely charged, and/or intentionally misrepresented to justify medically unnecessary procedures.

585. The Count II Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents, including NF-3, CMS-1500, and/or CMS-1450 forms containing material misrepresentations.

586. Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make No-Fault claim payments as a result of the Count II Defendants' unlawful conduct described herein.

587. By virtue of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Liberty Mutual, and Liberty Mutual is entitled to recover from each of the Count II Defendants three (3) times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## CADS ANESTHESIA SERVICES PLLC ENTERPRISE
## (Against PARS Medical P.C., Isaac Kreizman, M.D., and Charles Suede, M.D.)

588. Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 562 as if set forth fully herein.

589. Throughout their participation in the operation and management of CADS Anesthesia Services PLLC ("CADS Anesthesia"), Defendants PARS Medical P.C., Isaac Kreizman, M.D., and Charles Suede, M.D. (collectively, "Count III Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

590. The Count III Defendants employed two or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 9.

591. Among other things, NF-3, CMS-1500 and/or CMS-1450 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Liberty Mutual through the U.S. Mail.

592. Policies of insurance were delivered to insureds through the U.S. Mail.

593. Payments made by Liberty Mutual to CADS Anesthesia were delivered through the U.S. Mail.

594. As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3, CMS-1500 and/or CMS-1450 forms , and other claim-related documentation to Liberty Mutual related to services that were purportedly performed at CADS Anesthesia for the purpose of collecting payment from Liberty Mutual.

595. As a result of, and in reasonable reliance upon, the mailing of these materially false representations, Liberty Mutual made payment to CADS Anesthesia, for the benefit of one or more of the Count III Defendants, that would not otherwise have been paid.

596. The Count III Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents, each appearing legitimate on their face, also prevented Liberty Mutual from discovering this scheme for a long period of time, thus enabling the Count III Defendants to continue without being detected.

597. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

598. By creating and then mailing to Liberty Mutual (or directing the creation and subsequent mailing to Liberty Mutual) of numerous fraudulent documents in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

599. The activities alleged in this case had the direct effect of causing funds to be transferred from Liberty Mutual to CADS Anesthesia for the benefit of the Count III Defendants.

600. Liberty Mutual is in the business of writing insurance and paying claims. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Liberty Mutual's overall financial well-being and adversely affect insurance rates.

601. CADS Anesthesia constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

602. The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

603. Liberty Mutual is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property by reason of the Count III Defendants' conduct.

604. The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

605. By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from them three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## CADS ANESTHESIA SERVICES PLLC ENTERPRISE
## (Against PARS Medical P.C., Isaac Kreizman, M.D., and Charles Suede, M.D.)

606. Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 562 as if set forth fully herein.

607. Throughout their participation in the operation and management of CADS Anesthesia Services PLLC ("CADS Anesthesia"), Defendants PARS Medical P.C., Isaac Kreizman, M.D., and Charles Suede, M.D. (collectively, "Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

608. The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of CADS Anesthesia by means of a pattern of

racketeering activity, including numerous instances of mail fraud as set forth in Exhibit 9, and through the preparation and mailing of fraudulent documentation, including NF-3, CMS-1500 and/or CMS-1450 forms, to Liberty Mutual.

609. The purpose of the conspiracy was to obtain No-Fault benefit payments from Liberty Mutual on behalf of CADS Anesthesia, even though CADS Anesthesia, as a result of the Count IV Defendants' unlawful conduct, was not eligible to collect such No-Fault benefit payments.

610. The purpose of the conspiracy was also to seek No-Fault benefit payments from Liberty Mutual on behalf of CADS Anesthesia in connection with medical services that were falsely reported, not medically necessary, falsely charged, and/or intentionally misrepresented to justify medically unnecessary procedures.

611. The Count IV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents, including NF-3, CMS-1500 and/or CMS-1450 forms containing material misrepresentations.

612. Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make No-Fault claim payments as a result of the Count IV Defendants' unlawful conduct described herein.

613. By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Liberty Mutual, and Liberty Mutual is entitled to recover from each of the Count IV Defendants three (3) times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## <u>COUNT V</u>
## COMMON-LAW FRAUD
## (Against All Defendants)

614. Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 562 as if set forth fully herein.

615. The Defendants, PARS Medical P.C., CADS Anesthesia Services PLLC, Isaac Kreizman, M.D., Michael Garbulsky, RPA-C and Charles Suede, M.D. (collectively, "Count V Defendants") did conspire to defraud Liberty Mutual through billing for (a) services that were not provided; (b) services that involved unlawful referrals, undisclosed financial arrangements, and kickbacks; (c) services that were not medically necessary; and (d) charges that exceeded the amounts allowed under the applicable Fee Schedule.

616. The Count V Defendants intentionally made false statements of material fact to Liberty Mutual, and also concealed material facts from Liberty Mutual in the course of their submission of bills.

617. The false and fraudulent statements of material fact include representations of: billing for (a) services that were not provided; (b) services that involved unlawful referrals, undisclosed financial arrangements, and kickbacks; (c) services that were not medically necessary; and (d) charges that exceeded the amounts allowed under the applicable Fee Schedule.

618. Liberty Mutual reasonably relied, to its detriment, upon the Count V Defendants' material misrepresentations concerning the Defendants' eligibility to receive No-Fault reimbursement in paying numerous bills for healthcare expenses pursuant to No-Fault insurance claims.

619. Liberty Mutual has been injured in its business and property by reason of the above-described conduct because Liberty Mutual has made No-Fault benefit payments totaling over $785,426.21 in connection with fraudulent bills submitted by the Count V Defendants.

## COUNT VI
## UNJUST ENRICHMENT
## (Against All Defendants)

620. Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 562 as if set forth fully herein.

621. The Defendants, PARS Medical P.C., CADS Anesthesia Services PLLC, Isaac Kreizman, M.D., Michael Garbulsky, RPA-C and Charles Suede, M.D. (collectively, "Count VI Defendants") conspired to induce Liberty Mutual to make numerous and substantial payments pursuant to New York's No-Fault laws.

622. As alleged herein, PARS Medical P.C. and CADS Anesthesia Services PLLC were not eligible for reimbursement under New York's No-Fault laws because they billed (a) services that were not provided; (b) services that involved unlawful referrals, undisclosed financial arrangements, and kickbacks; (c) services that were not medically necessary; and (d) charges that exceeded the amounts allowed under the applicable Fee Schedule.

623. When Liberty Mutual paid PARS Medical P.C. and CADS Anesthesia Services PLLC, Liberty Mutual reasonably believed that it was legally obligated to make such payments based upon the misrepresentations that the Count VI Defendants, made concerning their reimbursement eligibility.

624. Each and every No-Fault reimbursement payment that Liberty Mutual was caused to make to PARS Medical P.C. and CADS Anesthesia Services PLLC during the course of the scheme constitutes a benefit that the Count VI Defendants aggressively caused PARS Medical P.C. and CADS Anesthesia Services PLLC to seek and voluntarily accept.

625. Throughout the course of their scheme, the Count VI Defendants caused PARS Medical P.C. and CADS Anesthesia Services PLLC to wrongfully obtain from Liberty Mutual No-Fault benefit payments totaling at least $827,647.42 as a direct and proximate result of the unlawful

conduct detailed throughout this Complaint.

626. Throughout the duration of this scheme, the Count VI Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Liberty Mutual was wrongfully induced to make to PARS Medical P.C. and CADS Anesthesia Services PLLC.

627. Retention of those benefits by the Count VI Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT VII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
## (Against PARS Medical P.C. and CADS Anesthesia Services PLLC)

628. Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegations set forth in paragraphs 1-562 as if set forth fully herein.

629. To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

630. PARS Medical P.C. and CADS Anesthesia Services PLLC billed for (a) services that were not provided; (b) services that involved unlawful referrals, undisclosed financial arrangements, and kickbacks; (c) services that were not medically necessary; and (d) charges that exceeded the amounts allowed under the applicable Fee Schedule.

631. PARS Medical P.C. and CADS Anesthesia Services PLLC continues to submit No-Fault claims to Liberty Mutual demanding payment, and other assigned No-Fault claims remain pending with Liberty Mutual.

632. PARS Medical P.C. and CADS Anesthesia Services PLLC continues to challenge Liberty Mutual's prior claim denials.

633. PARS Medical P.C. and CADS Anesthesia Services PLLC continues to commence

litigation or arbitration against Liberty Mutual seeking payment of No-Fault benefits allegedly due and owing.

634. A justifiable controversy exists between Liberty Mutual and PARS Medical P.C. and CADS Anesthesia Services PLLC because they reject Liberty Mutual's ability to deny such claims.

635. Liberty Mutual has no adequate remedy at law.

636. PARS Medical P.C. and CADS Anesthesia Services PLLC will also continue to bill Liberty Mutual for No-Fault benefits payments absent a declaration by this Court that its activities are unlawful, and that Liberty Mutual has no obligation to pay the pending, previously denied, and/or any future No- Fault claims submitted by PARS Medical P.C. and CADS Anesthesia Services PLLC.

637. Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 22 U.S.C. §§ 2201 and 2202, declaring that PARS Medical P.C. and CADS Anesthesia Services PLLC, at all relevant times, acted unlawfully when they billed for (a) services that were not provided; (b) services that involved unlawful referrals, undisclosed financial arrangements, and kickbacks; (c) services that were not medically necessary; and (d) charges that exceeded the amounts allowed under the applicable Fee Schedule.

## X. DEMAND FOR RELIEF

WHEREFORE, plaintiffs, LM Insurance Corporation, Liberty Mutual Fire Insurance Company, Liberty Mutual Personal Insurance Company, LM General Insurance Company, Safeco Insurance Company of Illinois, American States Insurance Company, and Wausau Underwriters Insurance Company (collectively, "Liberty Mutual" and/or "plaintiffs"), respectfully pray that judgment enter in their favor, as follows:

**<u>COUNT I</u>**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**PARS MEDICAL P.C. ENTERPRISE**
**(Against CADS Anesthesia Services PLLC, Isaac Kreizman, M.D., Michael Garbulsky, RPA-C, and Charles Suede, M.D.)**

a. AWARD Liberty Mutual's actual and consequential damages to be established at trial;

b. AWARD Liberty Mutual's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c. GRANT injunctive relief enjoining the Count I Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d. GRANT all other relief this Court deems just.

**<u>COUNT II</u>**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**PARS MEDICAL P.C. ENTERPRISE**
**(Against CADS Anesthesia Services PLLC, Isaac Kreizman, M.D., Michael Garbulsky, RPA-C, and Charles Suede, M.D.)**

a. AWARD Liberty Mutual's actual and consequential damages to be established at trial;

b. AWARD Liberty Mutual's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c. GRANT injunctive relief enjoining the Count II Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d. GRANT all other relief this Court deems just.

**<u>COUNT III</u>**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**CADS ANESTHESIA SERVICES PLLC ENTERPRISE**
**(Against PARS Medical P.C., Isaac Kreizman, M.D., and Charles Suede, M.D.)**

a. AWARD Liberty Mutual's actual and consequential damages to be established at trial;

b. AWARD Liberty Mutual's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c. GRANT injunctive relief enjoining the Count III Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d. GRANT all other relief this Court deems just.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**CADS ANESTHESIA SERVICES PLLC ENTERPRISE**
**(Against PARS Medical P.C., Isaac Kreizman, M.D., and Charles Suede, M.D.)**

a. AWARD Liberty Mutual's actual and consequential damages to be established at trial;

b. AWARD Liberty Mutual's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

c. GRANT injunctive relief enjoining the Count IV Defendants from engaging in the wrongful conduct alleged in the Complaint; and

d. GRANT all other relief this Court deems just.

**COUNT V**
**COMMON-LAW FRAUD**
**(Against All Defendants)**

a. AWARD Liberty Mutual's actual and consequential damages to be established at trial;

b. AWARD Liberty Mutual its costs, including, but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

c. AWARD Liberty Mutual its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

d. GRANT all other relief this Court deems just.

**COUNT VI**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

a. AWARD Liberty Mutual's actual and consequential damages to be established at trial; and

b. GRANT all other relief this Court deems just.

## COUNT VII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
## (Against PARS Medical P.C. and CADS Anesthesia Services PLLC)

a. DECLARE that none of the PARS Medical P.C. and CADS Anesthesia Services PLLC billing submitted to Liberty Mutual is compensable;

b. DECLARE that the PARS Medical P.C. and CADS Anesthesia Services PLLC, at all relevant times, purportedly provided medically unnecessary services pursuant to improper referrals, and submitted excessive charges to Liberty Mutual, and thus have no standing to submit or receive assigned benefits under New York's No-Fault Law.

c. DECLARE that PARS Medical P.C. and CADS Anesthesia Services PLLC's activities are unlawful;

d. DECLARE that Liberty Mutual has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by PARS Medical P.C. and CADS Anesthesia Services PLLC; and

e. GRANT all other relief this Court deems just.

## JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

KING, TILDEN, MCETTRICK & BRINK, P.C.

*/s/ Shauna L. Sullivan*

______________________

Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Shauna L. Sullivan (SS5624)
ssullivan@ktmpc.com
350 Granite St., Suite 2204
Braintree, MA 02184
(617) 770-2214

Attorneys for the Plaintiffs,
*LM Insurance Corporation,*
*Liberty Mutual Fire Insurance Company,*
*Liberty Mutual Personal Insurance Company,*
*LM General Insurance Company,*
*Safeco Insurance Company of Illinois,*
*American States Insurance Company, and*
*Wausau Underwriters Insurance Company*

Dated: May 29, 2025